THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PROSECUTOR, v. STATE BOARD OF ASSESSORS.

THE PHILADELPHIA AND READING RAILWAY COMPANY, PROSECUTOR, v. STATE BOARD OF ASSESSORS.

THE LEHIGH VALLEY RAILROAD COMPANY, PROSE-CUTOR, v. STATE BOARD OF ASSESSORS.

THE BERGEN COUNTY RAILROAD COMPANY, PROSE-CUTOR, v. STATE BOARD OF ASSESSORS.

THE LONG DOCK COMPANY, PROSECUTOR, v. STATE BOARD OF ASSESSORS.

THE TRENTON AND NEW BRUNSWICK RAILROAD COM-PANY, PROSECUTOR, v. STATE BOARD OF ASSESSORS.

THE MORRIS AND ESSEX RAILROAD COMPANY AND THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, PROSECUTORS, v. STATE BOARD OF AS-SESSORS.

Argued March 9 and 23, 1907—Decided August 6, 1907.

1. The revised act of 1888 for the taxation of railroad and canal property (*Pamph. L.* 1888, *p.* 269; *Gen. Stat., p.* 3324), as amended by chapters 82, 122 and 280 of the laws of 1906 (*Pamph. L., pp.* 121, 220, 571), is constitutional.
2. The acts referred to do not violate article 4, section 7, paragraph 12 of the constitution of this state, which requires that "property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."
3. The acts in question do not deprive the taxpayer of property without due process of law, nor deny the equal protection of the laws, within the meaning of the fourteenth amendment of the constitution of the United States.
4. Chapter 82 of the laws of 1906 (*Pamph. L., p.* 121), which imposes upon the main stem or waterway and the tangible personal

property and franchise of every railroad and canal company the "average rate of taxation," to be ascertained by computation from the taxing rates prevailing in the several taxing districts of the state, is not unconstitutional.

5. The so-called Perkins act (*Pamph. L.* 1906, *p.* 571), which requires that what is known as "second-class" railroad and canal property shall be assessed and taxed in each taxing district in the same manner and at the same rate as other property located in such district, and that the tax thereon shall be paid to the proper officers of the several taxing districts, is not unconstitutional.

6. The fact that all property used for railroad and canal purposes may be set apart in a class by itself, as distinguished from the general mass of property in the state, for purposes of taxation, does not negative the propriety of subdividing this general class of property into minor classes for the purpose of taxation; nor is the subclassification special, and hence unconstitutional, provided it rests upon grounds of discrimination inherent either in the character of the property or its situation and circumstances, such as to render the distinction reasonably appropriate to the purposes of the classification.

7. The legislative purpose being to divide property used for railroad and canal purposes into two parts, upon one of which taxes are to be levied for the support of local and municipal government, either together with or separate from taxes for the support of the general state government, leaving the residue to be subjected to taxation for general state purposes only—*Held*, that the setting apart of what is known as "second-class" railroad and canal property for local taxation, "second-class" property being defined in substance as including passenger and freight buildings, and all other real estate used for railroad and canal purposes, other than the roadbed or waterway, not exceeding one hundred feet in width, is reasonably germane to the purpose of the classification.

8. In article 4, section 7, paragraph 12 of the constitution of this state, the phrase "uniform rules" does not refer to those regulations that pertain to the agencies and methods employed in the assessment and collection of taxes, but only to the basic rules for taxation, which settle how the public burden is to be distributed, including the designation of the property that is to contribute, and the rate or ratio by which the taxes are to be laid and apportioned.

9. The constitutional requirement of uniform rules for taxation is satisfied by a uniformity that obtains without discrimination throughout a class of property set apart on reasonable grounds for separate treatment.

10. Since the Tax laws under consideration do not deprive the taxpayer of property without due process of law, and since they conform to the constitutional requirement that "property shall be assessed for taxes under general laws, and by uniform rules, according to its true value," it follows that they do not deny to the taxpayer "the equal protection of the laws."

On *certiorari.*

Before Justices FORT, HENDRICKSON and PITNEY.

For the Central Railroad Company and the Philadelphia and Reading Railway Company, *George Holmes* and *Richard V. Lindabury.*

For the Lehigh Valley Railroad Company, the Bergen County Railroad Company and the Long Dock Company, *Collins & Corbin.*

·For the Trenton and New Brunswick Railroad Company, *Richard V. Lindabury.*

For the Morris and Essex Railroad Company and the Delaware, Lackawanna and Western Railroad Company, *William D. Edwards.*

For the state board of assessors, *Robert H. McCarter,* attorney-general; *Bennet Van Syckel* and *John R. Hardin.*

The opinion of the court was delivered by

PITNEY, J.   These writs of *certiorari* bring under review the taxes levied by the state board of assessors for the year 1906 upon the main stem, franchise and tangible personal property of each of the several prosecutors, under the act of March 27th, 1888, entitled "An act to revise and amend 'An act for the taxation of railroad and canal property,' approved April 10th, 1884, and the acts amendatory and supplementary thereto" (*Pamph. L.* 1888, *p.* 269; *Gen. Stat., p.* 3324), and a supplemental act approved April 5th, 1906, which is chapter 82 of the laws of that year. *Pamph. L.* 1906, *p.* 121.   It appears that the state board, in obedience to the supplemental act last mentioned, made a valuation of the main stem and franchise, and also of the tangible personal property of each of the prosecutors, so far as taxable under chapter 82, and

that they imposed thereon a tax for state uses for the year 1906 at the "average rate of taxation" ($1.801 per $100).

The reasons assigned for the reversal of these taxes include an attack upon the act of March 27th, 1888, as amended in 1906, for unconstitutionality, it being claimed to be in violation of paragraph 12 of section 7 of article 4 of the constitution of this state, which requires that "property shall be assessed for taxes under general laws and by uniform rules according to its true value," and in violation of the first section of the fourteenth amendment of the constitution of the United States, which provides that no state shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." It is asserted that the act, as it now stands, provides for an arbitrary segregation of a part of that class of property which is distinguished as "property used for railroad and canal purposes," and requires that such segregated part be assessed for taxes by a special law and by rules differing from the rules prescribed for the assessment of all other property of said class; that three certain supplements passed in the year 1906 to the act of March 27th, 1888, to wit, chapters 82, 122 and 280 of the laws of 1906, are void because they destroy the classification of property for taxes theretofore existing under the act of 1888, and that these supplements provide a scheme for the valuation, assessment and taxation of property used for railroad and canal purposes by rules which are not uniform, and for its taxation otherwise than according to its true value.

It is further alleged in the reasons that the basis adopted for taxing the main stem, franchise and tangible personal property in the cases before us, and the rate applied, were unconstitutional, illegal and unjust, and that the taxes in question are arbitrary taxes, imposed without regard to the necessities of the state and in excess of its needs. Upon the argument, however, it was not at all claimed that the particular taxes under review were imposed otherwise than in accordance with the true intent and meaning of the several acts of the legislature in question. The entire argument was rested upon the

contention that chapters 82, 122 and 280 of the laws of 1906 are unconstitutional.

The questions at issue were most elaborately argued with much learning, force and ingenuity, and counsel on both sides expressed the earnest desire that this court would give to them the fullest consideration, in spite of (perhaps because of) the avowed purpose to review our decision in the court of last resort, whatever the outcome here. In view of the very great importance of the subject we have endeavored to comply with the desire of counsel thus expressed.

The act of April 10th, 1884, for the taxation of railroad and canal property (*Pamph. L., p.* 142; *Supp. Rev.* 1886, *p.* 1002), was sustained as constitutional by the Court of Errors and Appeals in *State Board of Assessors* v. *Central Railroad Co.,* 19 *Vroom* 146.

The act of 1888, which took its place (*Pamph. L., p.* 269; *Gen. Stat., p.* 3324), preserves the same general scheme, eliminating, however, certain features of the former act which had been held unconstitutional in *Central Railroad Co.* v. *State Board,* 20 *Vroom* 1, and *Williams* v. *Bettle,* 22 *Id.* 512.

The act of 1888 provides that all the property of any railroad or canal company not used for railroad or canal purposes shall be assessed and taxed by the same assessors and in the same manner and at the same rate as the taxable property of other owners in the same municipal division or taxing district; that all other property of any railroad or canal company shall be assessed and taxed as in this act directed, and that the tax imposed by this act shall be in lieu of all other taxation upon the property subject to taxation under the provisions of this act. It is made the duty of the state board of assessors to annually ascertain the true value of all property used for railroad or canal purposes of each railroad and canal company, including its franchise, and in such ascertainment to ascertain—*first,* the length and value of the main stem of each railroad and of the waterway of each canal, and the length thereof in each taxing district ("main stem" being declared to include the roadbed, not exceeding one hundred feet in width, with its rails and sleepers and passenger depot

buildings, and the term "waterway" to include the towing-path and berme-bank) ; *second,* the value of the other real estate used for railroad or canal purposes in each taxing district, including the roadbed (other than main stem), waterways, reservoirs, tracks, buildings, water tanks, water works, riparian rights, docks, wharves and piers and all other real estate except lands not used for railroad or canal purposes; this class of property is, for convenience, commonly called "second-class railroad or canal property;" *third,* the value of all the tangible personal property of each railroad and of each canal company, and *fourth,* the value of the remaining property, including the franchise.

By the act of 1888 the state board of assessors, having completed their valuation and assessment, were required to compute the taxes upon the entire assessed valuation of each railroad and canal company as thus ascertained; upon such valuation each company was required to pay to the state for general state purposes a tax at the rate of one-half of one per centum annually, and also to pay a tax at the local rate (as fixed and assessed for county and municipal purposes upon other property in each taxing district) upon the valuation of its property in the several taxing districts other than main stem and waterway, but the last-mentioned rate was in no case to exceed one per centum of the valuation of such property. The sum of these was to constitute the tax upon each company, and was to be paid into the treasury of the state. The general tax of one-half of one per centum was to be applied to the uses of the state according to law, and the amounts received for taxes upon properties separately assessed in the different taxing districts ("second-class property") were appropriated to the various taxing districts, giving to each district the amount derived from the property of each company therein. This allotment of the separate tax upon second-class property to the several taxing districts was provided for by section 11 of the act (*Pamph. L.* 1888, *p.* 276), which was amended by a later act of the same year (*Pamph. L.* 1888, *p.* 376; *Gen. Stat., p.* 3333, § 242) in a respect not now material.

By *Pamph. L.* 1897, *p.* 147, and *Pamph. L.* 1898, *p.* 59, the law was amended so as to give to the several taxing districts the total amount of tax derived from second-class property therein.

Upon the argument herein it was fully conceded that the decision of the Court of Errors and Appeals in *State Board of Assessors* v. *Central Railroad Co.,* 19 *Vroom* 146, which sustained the original act of 1884, establishes the constitutionality of the revised act of 1888 and its supplements thus far mentioned.

A further supplement, known as the Duffield act (*Pamph. L.* 1905, *p.* 189), changed the law with respect to the taxation of second-class property and with respect to that alone. It subjected such property to taxation by the state board of assessors at the local rate of taxation obtaining in each of the several taxing districts in which the property is situate, without limiting this tax to one per centum as formerly. It did away with the former tax of one-half of one per centum upon second-class property, originally imposed for state purposes and afterwards allotted to the several taxing districts by the act of 1897. And it changed the law in one further respect, viz., that while under the act of 1888 the local rate was to be determined by the other property in the taxing district (*Williams* v. *Bettle,* 22 *Vroom* 512, 515), under the Duffield act the second-class railroad and canal property was to be taken into the account in determining the local rate.

Since the argument herein the Court of Errors and Appeals has determined that the Duffield act is constitutional. *Bergen and Dundee Railroad Co.* v. *State Board of Assessors,* 45 *Vroom* 742.

We now come to the acts of 1906, which are the subject of the present controversy. They are all supplements to the act of 1888.

Chapter 82 (*Pamph. L.* 1906, *p.* 121), known as the "Average Rate law," provides for an annual valuation to be made by the state board of assessors of the main stem or waterway, tangible personal property and franchise of each railroad and canal company, and for the payment to the state of an annual

tax thereon at the "average rate of taxation," to be computed by the state board of assessors by taking into consideration the true value of all property, real and personal, in each taxing district (including second-class railroad and canal property, but excluding the main stem or waterway, franchise and tangible personal property of the railroad and canal companies), and by taking into consideration the rate of taxation in the several taxing districts. The total taxes of each district are to be determined by multiplying the value of all the property in such district by the rate of taxation therein, and the aggregate taxes of the state as thus computed and determined are to be divided by the aggregate value of the general property in the state, to be ascertained as above mentioned, the result being the "average rate of taxation," at which rate the main stem or waterway, tangible personal property and franchise of each of the companies is to be taxed by the state board. This act was approved April 5th, 1906.

Next in order is chapter 122, which was approved on April 8th. *Pamph. L.* 1906, *p.* 220. It merely modifies the definition of the term "main stem" of railroads, so that hereafter it shall be held to include "the roadbed, not exceeding one hundred feet in width, with its rails and sleepers, and all structures erected thereon and used in connection therewith, not including, however, any passenger or freight buildings erected thereon." Its most important effect is to exclude passenger depots, which, by the act of 1888, were included in main stem.

Then comes chapter 280, which was approved May 18th, 1906 (*Pamph. L., p.* 571), and is known as the Perkins act. Its first section declares that "the taxes which shall hereafter be assessed upon the property of railroad and canal companies, referred to in subdivision 2 of section 3 of the act to which this act is a supplement, shall be assessed and taxed in each taxing district in this state in the same manner and at the same rate as other property located in said taxing district is assessed and taxed, and the amount of tax derived therefrom shall be paid to the officer of each of the separate taxing districts of the state as shall be by law entitled to receive the

same for the use of said taxing districts." Subsequent sections repeal all acts and parts of acts inconsistent herewith, and provide that this act shall take effect immediately.

As already mentioned, the taxes now under review are those imposed by the state board of assessors upon main stem, franchise and tangible personal property (commonly denominated first-class property) under chapter 82, the so-called "Average Rate law."

Some of the reasons assigned for reversal may be briefly disposed of.

And first, it was not claimed in the argument that the taxing scheme in question deprives the taxpayer of property without due process of law within the meaning of the fourteenth amendment. The act of 1888, in its twelfth section (*Gen. Stat.*, *p.* 3328), provides for a revision by the state board of their assessments at a time and place mentioned in the section, with opportunity to the taxpayer to present any complaint or grievance and have the same deliberately considered by the board, with compulsory attendance of witnesses and production of documentary evidence. No complaint that any company is assessed too low or that any property has been omitted is to be acted upon without notice to the taxpayer. And section 13 provides for a judicial review by *certiorari* in this court in cases where it is claimed that the amount of tax is excessive, and also where it is claimed that the principle upon which the assessment is made is erroneous. The rule established by repeated decisions of the United States Supreme Court is as expressed by Mr. Justice Brewer in *Winona and St. Peter Land Co.* v. *Minnesota*, 159 *U. S.* 537: "That a law authorizing the imposition of a tax or assessment upon property according to its value does not infringe that provision of the fourteenth amendment to the constitution, which declares that no state shall deprive any person of property without due process of law, if the owner has an opportunity to question the validity or the amount of it either before that amount is determined or in subsequent proceedings for its collection." See, also, *Kentucky Railroad Tax Cases*, 115 *U. S.* 321, 331; *Pittsburg, &c., Ry. Co.* v.

*Backus,* 154 *Id.* 421, 458.   There is clearly no deprivation of property without due process of law in the operation of the act of 1888.

It is contended by the prosecutors that the Perkins act has the effect of subjecting second-class property to local taxation, subject to all the incidental features of the General Tax law of the state, now found embodied in the revised act of 1903 for the assessment and collection of taxes.   *Pamph. L.* 1903, *p.* 394.   Without stopping at the moment to discuss the bearing or want of bearing of that question upon the validity of the taxes assessed upon first-class property under the "Average Rate law," it is sufficient to say that beyond question the General Tax law of the state gives ample opportunity for review, and does no violence to the "due process of law" clause.

Next, it was not claimed upon the argument that the rate of taxation imposed by chapter 82—what is called the "average rate" of taxation, to be computed by the state board of assessors as in that chapter provided—is violative of the constitutional rights of the prosecutors.   The act manifests an effort on the part of the legislature to approximate the annual burden of taxation upon first-class railroad and canal property to that which is borne generally by taxpayers throughout the state, and an intent to deal fairly with this class of property, not at all to discriminate against it in favor of other taxpayers. A Michigan statute, similar in principle, was sustained by the Supreme Court of the United States in *Michigan Central Railroad Co.* v. *Powers,* 201 *U. S.* 245.   The contention of the railroad company was succinctly stated by Mr. Justice Brewer (at *p.* 293), as follows: "The first and principal matter of attack is the 'average rate.'   It is contended that the fixing of the rate of taxation is a legislative function; that in ascertaining the average rate by the method described there is no exercise of the legislative judgment, but that it is determined by the action of the various local assessing and taxing boards, who, though charged with no duty of inquiry as to the necessities of the state or the proper rate of taxation of railroad property, are, in fact, the only officials exercising any discretion and judgment."   After ably combating

130        NEW JERSEY SUPREME COURT.

Central R. R. Co. of N. J. v. State Bd. Assessors. 75 N. J. L.

this argument, he summarizes the matter on *p.* 297, where he says: "It may be laid down as a general proposition that where a legislature enacts a specific rule for fixing a rate of taxation, by which rule the rate is mathematically deduced from facts and events occurring within the year and created without reference to the matter of that rate, there is no abdication of the legislative function, but, on the contrary, a direct legislative determination of the rate."

Nor was any reliance placed in the argument upon such of the reasons assigned as challenge the taxes in question as being arbitrary, and imposed without regard to the necessities of the state and in excess of its needs. It is hardly necessary to say that the legislature is the proper judge of the amount of money required to be raised by taxation for the conduct of the government of the state, and that it is not obliged to determine in advance the necessity for raising any specific sum of money as is required in the case of some of the municipal governments.

This brings us to the controverted questions.

The principal contention made in behalf of the prosecutors is that chapters 82 (the "Average Rate law") and 280 (the Perkins act), taken together, so modify the act of 1888 for the taxation of railroad and canal property as to destroy the generality of the classification adopted in the act of 1888, and subject different sorts of property used for railroad and canal purposes to different rules and to rules that are not uniform within the meaning of our constitution. But chapter 82 does no more (except for some modifications relating to matters of administration, which will be dealt with further on) than to substitute for the annual tax of one-half of one per centum on "first-class property" for strictly state purposes a tax upon the same property for the same purposes at a different rate— a rate that is unexceptionable from the constitutional standpoint as already shown. And so the Perkins act is the chief subject of criticism. Manifestly this latter supplement modifies the scheme of the Duffield act so far as to require second-class property to be assessed by the local assessors (still at the local rate as in the Duffield act), and the tax thereon to be

paid directly to the proper officer of the several taxing districts. The learned counsel for the state board of assessors contend that the modification goes no further, and that the Perkins act still leaves second-class property in all other respects subject to the provisions of the act of 1888, including those that have to do with the mode in which the assessments are to be reviewed, how payment of the taxes is to be enforced, the penalties to be imposed for non-payment, and other details of an administrative character. Counsel for the prosecutors contend, on the other hand, that the effect of the Perkins act is to remove second-class property entirely without the scope of the act of 1888, and to subject it to the provisions of the General Tax law of the state as revised in 1903. *Pamph. L.* 1903, *p.* 394. This question will be dealt with in its order. Our first and most important inquiry is whether the Perkins act destroys the generality of the classification adopted in the act of 1888 by subjecting different sorts of property to improper discriminations and non-uniform rules through the adoption of a distinction (that between first-class and second-class property) that has no reasonable pertinency to the main object of the act (which is to establish the purposes for which and the rate at which second-class property is to be taxed), so that the classification is rendered illusory and the law therefore special.

It is, indeed, argued by the learned counsel for the respondents, and with much force, that if this act is unconstitutional it is simply void and of no effect, so that the prior legislation stands as if this supplement had not been passed; that since the Perkins act was enacted subsequent to chapter 82 (*Pamph. L.* 1906, *p.* 121), under which the taxes now in question were assessed, a declaration that the Perkins act is void would in nowise affect these taxes; that (leaving out the Perkins act) the duty of the state board was to assess both first and second-class property, while in fact they assessed first-class property only in the present cases, and that the circumstance that second-class property was omitted does not defeat the assessment upon first-class property at the instance of the taxpayer. We are inclined to agree with this view, which, if correct,

would render the question of the constitutionality of the Perkins act unnecessary to be determined in the present cases. But the latter question is of the utmost magnitude and importance; it is fairly presented and has been elaborately argued, and its prompt solution is highly desirable. Moreover, in a case that was argued together with the present cases (United New Jersey Railroad and Canal Co. et al., prosecutors, v. W. Frank Parker, Collector, and the City of New Brunswick), and which is to be decided upon the present opinion, taxes locally assessed by the city assessor upon second-class property by virtue of the Perkins act are involved, and these taxes are necessarily invalid if the Perkins act be void. We must therefore determine the question of its constitutionality.

Now, as we understand the decisions of the Court of Errors and Appeals in *State Board of Assessors* v. *Central Railroad Co.,* 19 *Vroom* 146, and in the recent case of *Bergen and Dundee Railroad Co.* v. *State Board of Assessors,* 45 *Id.* 742, they have the effect of settling every question that is here controverted about the subclassification of railroad and canal property that is adopted in the Perkins act and the other supplements of 1906. The act of 1884, which was sustained in 19 *Vroom,* subdivided property used for railroad and canal purposes into the same two sorts, commonly called first-class and second-class property. The line of demarcation between them was not changed by the act of 1888, and is not materially changed by chapter 220 of the laws of 1906. The act of 1884, by its third section (*Supp. Rev.* 1886, *p.* 1003), required these two sorts of property to be separately valued. It likewise required the value of second-class property to be separately valued in each taxing district. That decision not only upheld the main classification that distinguished railroad and canal property from other property in the state, but also the subclassification of railroad and canal property into main stem and waterway, on the one hand, and second-class property on the other. The act there sustained, like the present legislation, imposed different rates of tax, and taxes for different purposes, upon the two classes of property.

Indeed, the subclassification was established to that end and no other. By the act of 1884, as by the Duffield act of 1905, and now again by the Perkins act, second-class property was subjected to the local rate of taxation, and for local purposes, the only differences affecting the rate being those pointed out in the opinion in the Bergen and Dundee railroad case, and there treated as non-essential, viz., that in the act of 1884 there was a limitation of one per centum upon the tax that was to be imposed on this account, which limitation is now repealed; under the act of 1884 the local rate was determined by the other property in the taxing district, while by the Duffield act (as now by the Perkins act) the second-class railroad and canal property is to be taken into account in determining the local rate; and under the act of 1884 there was a tax of one-half of one per centum upon second-class property for state purposes, which is now omitted. The taxation of second-class property for local purposes at local rates, without the previous limitation of one per centum, was upheld in the Bergen and Dundee railroad case. The same rule of taxation, so far as the purpose and the rate are concerned, is perpetuated in the Perkins act. In the remaining essential element that determines the annual burden of taxation—the valuation of the property—all these laws are alike. Upon them all the constitution imposes the rule of "true value," whether expressed in the legislation or not, unless, indeed, this standard is excluded by the words or necessary effect of the act. The contention of the prosecutors upon this point will be separately dealt with.

Passing this for the moment, what difference remains in essentials between the scheme of the Perkins act and those that have preceded it? Can it make the least difference that the tax on second-class property is now to be paid directly to the taxing district, instead of being paid into the central treasury of the state and thence disbursed to the taxing district as formerly? Obviously not. State treasury and taxing district alike are but agencies of the state. Under either arrangement the moneys collected from the taxpayer are in a proper sense the moneys of the state, set apart by the general legis-

lative authority for expenditure locally by a local agency of the state. Can it make any difference that under the new arrangement one set of public functionaries are to value one part of the property used for railroad and canal purposes, while another set are to value the remainder? Clearly, so long as "true value" is the rule prescribed for both, there can be no difference in the result except on the theory that one officer will perform his duty while the other departs from his, or else on the theory that both will depart from their duty but in different modes or in varying degrees. But a law is not to be held unconstitutional on the theory that public officers may fail in the performance of a public duty plainly prescribed. Aside from the inevitable instances of individual error, for the correction of which reviews and appeals are provided, the presumption is that public officers will perform their duty. To quote the familiar language of Mr. Justice Miller, in *Cummings* v. *National Bank,* 101 *U. S.* 161: "A law cannot be held unconstitutional because, while its just interpretation is consistent with the constitution, it is unfaithfully administered by those who are charged with its execution: Their doings may be unlawful while the statute is valid."

But while it is conceded that the decision of the Court of Errors and Appeals in 19 *Vroom* establishes that property may be classified for the purpose of taxation according to its use, and that property used for railroad and canal purposes may be set apart into a class by itself, it is insisted that any rule which is adopted by the legislature for the taxation of this class must be uniform as to the whole of the class, and that in 19 *Vroom* the act of 1884 was sustained only because it embraced all property devoted to railroad and canal uses. It is pointed out that the decision of the court was justified, in every opinion written to uphold it, upon the ground that the use to which property is devoted constitutes a legitimate basis for classification, and that in the act under consideration the classification embraced all the property devoted to a similar use. This is quite true with respect to so much of the reasoning of the judges as dealt with the discrimination

JUNE TERM, 1907.  135

*46 Vroom.*  Central R. R. Co. of N. J. v. State Bd. Assessors.

that the act established between railroad and canal property and the general mass of taxable property in the state. And it is equally true that the opinions have little to say about the subdivision of railroad and canal property into what we now call first-class and second-class property. The explanation of this is to be found in the history of the case as reported. In this court (19 *Vroom* 1) the act of 1884 was denounced by Chief Justice Beasley, in a vigorous opinion, as violating the constitution by making what he deemed an arbitrary discrimination between railroad and canal property on the one hand, and other taxable property in general on the other. Overlooking the force of the fact that the distinction was based upon the *use* to which the property was devoted, and finding nothing in the *nature or situation* of the property to warrant its being separately treated, he naturally reached the conclusion that this primary classification was illusory and arbitrary, and the law therefore special. This was the entire burden of the argument employed by him upon this topic, as the following expressions used in his opinion will show, viz. (at *p.* 14): "To take a part of a homogeneous mass of property, the whole being *identically conditioned,* and to tax such part exclusively, would be an act of selection at will, and not a classification, and the law authorizing it would be a special and not a general law." And again: "A class cannot be created at the will of the legislature, but must arise out of the *nature* of the things classed." On *p.* 16: "When the constitution declares that property shall be assessed for taxes by a general law, it is a virtual declaration that property must be classified upon the basis of its own *nature and quality* if it is to be separately and exclusively taxed." On *p.* 19: "What we are unable to assent to is that certain property can be subtracted from the mass of property, it being *identical in its nature* with such mass, and thus, being arbitrarily isolated, can be subjected to a tax of the same kind." And again: "Its effect [meaning the act of 1884] simply is to segregate certain property from the mass of *similar* property; not to put upon it a proportionate part of a general tax, but to charge the part so segregated with

the whole amount of a separate tax." On *p.* 20: "And so with the lands and tangible personal property of these separate corporations, and which denominated properties do not possess, from their *nature or qualities,* any *different characteristics* from the same kinds of property owned by other persons." It was to combat these views that the learned judges of the Court of Errors and Appeals employed the language referred to by counsel for the prosecutors as authority for the present contention that the decision vindicated only what we may call the primary classification of the act of 1884.

As we take it, the secondary classification, or subclassification, into first and second-class properties was equally vindicated by the decision. *Bergen and Dundee Railroad Co.* v. *State Board of Assessors, supra.*

But it is further argued, in effect, that this subclassification was sustained in the act of 1884 only on the ground that the tax of one-half of one per centum upon first-class property, taken together with the tax at local rates (not exceeding one per centum) upon second-class property, together constituted but a single tax. This argument seems to be rested upon a single phrase in the opinion of Chancellor Runyon (19 *Vroom,* at *p.* 282), where he said: "The fact that only part of the property is taken into account in one part of the method (*i. e.,* in making up the amount to be paid in respect of county and municipal taxes) is of no moment. The tax applied to state purposes and that applied to county and municipal purposes are one tax, and are to be so regarded." But a reference to other parts of the opinion shows that the expression "one tax" was not used in the sense now attributed to it by counsel, but as meaning a single scheme of taxation. The learned Chancellor had already pointed out (*Id.,* at *p.* 276) that the act of 1884 fixed the same rate of taxation for state purposes which had previously existed for many years, but assessed it upon the valuation of all the property of the company used for its purposes, including the franchises, and provided for local taxation on part only of such property. On *p.* 278 he treated the scheme of the act as

JUNE TERM, 1907.        137

*46 Vroom.*   Central R. R. Co. of N. J. v. State Bd. Assessors.

including "a tax for state purposes and tax for county and municipal purposes." And on *p.* 280 he used this language: "All taxes, whether levied for state, county or municipal purposes, are state taxes. They can be imposed by no other authority than that of the state. The state appropriates the proceeds to what purposes it sees fit, but however the proceeds may be appropriated, every tax is a state tax." All these expressions precede that phrase which is made the basis of the argument now under examination and throw light upon it. It seems to us plain enough that Chancellor Runyon entertained no other notion upon the subject than that held by the other judges who voted with him to sustain the act of 1884 *in toto.* Thus Justice Parker, in his opinion, employed the following language (*Id.,* at *p.* 297): "All taxes are, in one sense, state taxes. * * * Different agencies are employed to assess and collect, and the sums raised are applied to various public purposes." And on *p.* 298: "It [the legislature] has the power and the right to enact that local officers in each taxing district shall assess and collect for their respective districts the county, township and city taxes, and distribute the money without its passing through the state treasury; or to enact that a state board shall assess and collect all taxes and bring all the money into the treasury, in part to be distributed by the state among the municipalities; or to provide for a state board to assess and collect one portion of the tax, and local boards the residue." And Justice Scudder evidently had the notion of two taxes in his mind when, referring to the criticisms that are contained in the dissenting opinions of Justices Dixon and Reed, he said (*Id.,* at *p.* 291): "Suppose, as in this case, that the main stem, which includes the roadbed, not exceeding one hundred feet in width, with its rails, sleepers, &c., is assessed at one rate, and the other real estate used for railroad purposes in each taxing district is assessed at another rate, and no good reason is assigned for such difference. * * * These inequalities arise mainly from the fact that some railroad corporations have acquired more of a certain kind of property than others, and they have extended their holding in many cases far

beyond the width of one hundred feet for the main stem of the road as originally intended and provided for in their charters. If all are taxed alike for such excess, the rule of uniformity is not thereby violated. Have not the legislature the legal right to say that for the main stem of the road, one hundred feet in width, which the original charters contemplated the railroad companies should hold and use, they will tax at the rate of one-half of one per centum for state purposes, which was the amount fixed in most, if not in all, charters, but for all acquired beyond one hundred feet in width a greater tax shall be paid, not to exceed in the aggregate of both taxes the local rate as fixed and assessed for county and municipal purposes?"

If we are wrong in our view that the decision in 19 *Vroom* settles the question of the constitutionality of subdividing railroad and canal property into "first-class" and "second-class" property for the purpose of imposing separate and distinct taxes upon the respective classes, then it seems to be necessary to discuss that question upon its merits. The recent decision sustaining the Duffield act seems to carry us no further than does 19 *Vroom*, for that act still required the valuation and assessment of second-class property to be made by the state board and the tax to be imposed by them and collected by the comptroller of the state; hence it is claimed that under the scheme of the Duffield act the combined taxes upon first-class and second-class properties constituted a "single tax" in every sense the same as before; whereas under the Perkins act the tax upon second-class property is to be kept entirely separate from that upon first-class property.

Treating the question as open, therefore, our view of it is as follows:

The fact that all property used for railroad and canal purposes may properly be set apart in a class by itself, as distinguished from the general mass of property in the state, for purposes of taxation, does not at all negative the propriety of subdividing this general class of property into minor classes for the purpose of taxation. Nor is the subclassification

special, and hence unconstitutional, provided it rests upon grounds of discrimination inherent either in the character of the property or in its situation and circumstances, such as to render the distinction reasonably appropriate to the purposes of the classification.

The purpose of this subclassification is to designate a portion of the mass of real estate that is used for railroad and canal purposes, upon which portion taxes are to be levied for the support of local and municipal government, either together with or separate from taxes for the support of the general state government, leaving the residue of the property that is used for railroad and canal purposes to be subjected to taxation for general state purposes only. The line of demarcation between the two subdivisions is chosen with little reference to the use to which the property is devoted, but with especial reference to the location and situation of that which is to be locally taxed. Structures *used* in connection with the roadbed are placed on one side of the chosen line; buildings *used* for accommodating passengers or freight on the other. So far, the line of definition follows the use. Aside from this, use has little or nothing to do with it. Practically, the line of division is: "Main stem" within one hundred feet, waterway, towing-path, berme-bank, on the one side; these are continuous, running from end to end of the railroad or canal; all other real estate used for railroad or canal purposes goes into the other division. Is this mode of division reasonably germane to the purposes of the classification? And why?

In our legislation it has at all times been recognized that the land indispensable for the use of a railroad as a public highway is a belt or strip of limited width. To cite a few of the old special charters as typical instances: In that of the Camden and Amboy Railroad and Transportation Company (*Pamph. L.* 1830, *p.* 86, § 11) it was provided "that the said road or its branches shall not exceed one hundred feet in width on the surface of the road." In the case of the New Jersey Railroad and Transportation Company (*Pamph. L.* 1832, *p.* 98, § 6) the corporation was empowered to survey, lay out

and construct a "railroad not exceeding sixty-six feet in width." The charter of the Morris and Essex Railroad Company (*Pamph. L.* 1835, *p.* 27, § 6) likewise limited the width of the railroad to sixty-six feet. In the charter of the Somerville and Easton Railroad Company (*Pamph. L.* 1847, *p.* 130, § 6) the limitation was "not exceeding one hundred feet in width." Similar limitations were, we believe, included in most, if not all, of the special railroad charters. In the General Railroad law of April 2d, 1873, it was provided by section 11 (*Rev.* 1877, *p.* 927, *pl.* 99; amended, *Pamph. L.* 1891, *p.* 129; *Gen. Stat., p.* 2660, *pl.* 83) "that any railroad constructed under the provisions of this act shall not exceed a hundred feet in width unless more land shall be required for the slopes of cuts and embankments." And in the revised act of 1903 concerning railroads (*Pamph. L.* 1903, *p.* 649, § 7) it is declared that "the right of way of any railroad or of any branch thereof shall not exceed one hundred feet in width unless more land shall be required for the slopes of cuts and embankments or for retaining walls, in which case such land may be acquired as part of such right of way."

At the same time it has always been recognized that railroad companies incorporated by special charter possess the incidental power to hold land outside of the limits fixed for its railroad, so far as such land is reasonably necessary or proper for the accomplishment of the objects of the incorporation. A power to this effect was expressly conferred by the General Railroad law of 1873, section 1 of which authorized companies incorporated thereunder "to purchase, hold and use all such real estate or other property as may be necessary for the construction and maintenance of its railroad, and the stations and other accommodations necessary to accomplish the objects of its incorporation." And also "to lay out its road as hereby provided, and to construct the same, and for the purposes of cuttings and embankments, to take as much more land as may be necessary for the proper construction and security for the road." And section 17 of the same act authorized such companies to hold real estate at or near the termini, or at any other point on the line of the road where

the directors should think proper to establish a depot, not exceeding ten acres at each place, and also to erect and build thereon houses, warehouses, workshops, and such other buildings and improvements as they may deem expedient for the safety of their property, and for other necessary uses appertaining to their business, and receive the rents and emoluments thereof; and that all lands and real estate acquired by any such company not used by it for the immediate use and occupancy of its rails, tracks, depot and freight buildings should be subject to the same tax as the property of individuals, and said tax should be levied and collected by the local authorities where the same may lie, in the same manner as other taxes. The revised Railroad act of 1903 (*Pamph. L., p.* 647, § 3) confers the express power to acquire and hold land necessary for terminal purposes, and for the construction and maintenance of the railroad and stations, branches, sidings, car-yards, engine-houses, repair shops, and other accommodations necessary to accomplish the objects of the incorporation.

The distinction between the continuous belt of land, without which a railroad could not exist as a highway, and other sorts of railroad property, was early recognized as having something to do with the question of taxation. As pointed out in the opinion of the Chancellor in 19 *Vroom,* at *p.* 273, the legislature, prior to the adoption of the constitutional amendment that "property shall be assessed for taxes under general laws, and by uniform rules, according to its true value," passed the act of April 2d, 1873 (*Pamph. L., p.* 112; *Rev.* 1877, *p.* 1166), the preamble of which recited that for the encouragement of railroad enterprise, laws creating and regulating railways in this state usually provided for the payment by them, in consideration of their chartered privileges, of a fixed rate upon their capital stock or the cost of their works, in lieu of all other public impositions, and that it was nevertheless contended that the property of such corporations, being largely acquired for or through the growth and extension of their prosperity, *should contribute to the charges and expenditures for municipal and county purposes,* and that it

was desirable, in order to the avoidance of litigation and future dissatisfaction, *that such municipal and county taxation should be authorized,* and that the same should be permanently fixed and regulated. The act proceeded to provide for a scheme of taxation as follows: *First,* that the companies should pay upon the "cost, equipment and appendages of said railroads," respectively, a state tax, at the rate theretofore fixed by law, or, in default thereof, at the rate of one-half of one per centum upon such cost; and *secondly,* on all the real property by them used or owned for the purposes of their road or otherwise, *excepting their main stem or roadbed and track, not exceeding one hundred feet in width, a county and municipal tax* for the benefit of the counties, townships and cities, respectively, where the same is situate, at the rate of one per centum upon a valuation thereof, and of all improvements thereof not by way of repairs, provided that at the termini of their roads each company might hold a tract of land not exceeding ten acres in one parcel, which, with the buildings and improvements thereon, should be free from the payment of county, township and municipal taxes.

And the General Railroad law of 1873 (approved on the same day with the above act), in its nineteenth section, provided for an annual tax of one-half of one per centum upon the "cost, equipments and appendages" of the railroad, including the cost of the roadbed and such other taxes as might be assessed from time to time by a general law applicable to all railroads over which the legislature should have power for that purpose; and further provided, that the company should be regularly assessed and pay tax for the value of its real estate (*excepting the roadbed one hundred feet in width*), improvements thereon, and personal property as taxed *in the cities or townships wherein it lies,* at the same time and rate, and in the same manner, for the same purposes and by the same persons as other taxes assessed in said municipalities.

It will thus be seen that the distinction between the strictly essential "right of way," so called, of a railroad—the strip of land without which it could not exist as a public highway

and means of transportation across the state—and the remaining land of the company used for railroad purposes, is inveterate in our legislation. So far as the setting of these two different sorts of property into separate classes for purposes of taxation is concerned, the distinction rests, as we conceive, not so much upon the ground that they are devoted to different uses, as that the dependence of the several companies upon local police protection and the other advantages of municipal government, the benefits to be derived by them from such government, and hence the proper admeasurement of the tax that should be contributed by the companies to the respective local governments, are proportioned approximately to the amount of land held by them in the several municipalities above and beyond the main stem that is indispensably necessary for their traffic. This notion is expressed in the preamble of the act of 1873 for the taxation of railroad corporations above cited; the same notion is implicit, we believe, in the Railroad Tax acts of 1884 and 1888.

It seems to us entirely reasonable for the legislature, upon determining that property used for railroad and canal purposes should contribute directly to the cost of local government, to require the companies to contribute to the several taxing districts in a proportion based, with reasonable approximation to accuracy, upon the amount and value of the property held by them in the municipality. This was, in effect, done by the act of 1884 and by the revised act of 1888. And the same thing is, in effect, accomplished by the supplements of 1906, including the Perkins act. No doubt the legislature might have turned over the main stem as well as the second-class property to the several municipalities for purposes of taxation. It might have reserved all railroad and canal property for taxation by the state board for state purposes. It has chosen by the acts now under review to reserve for taxation for strictly state purposes the indispensable main stem, and to remit the other railroad property to local taxation.

Nor can it be said that the adoption of a width of one hundred feet as the limit of the main stem for the purposes of

this distinction is arbitrary in any sense that renders the classification illusory and the law therefore special. The limitation by width is only one of several limitations that go to make up the statutory definition of "main stem." As defined in chapter 122 of the laws of 1906, it does not extend beyond "the roadbed with its rails and sleepers and structures erected thereon and used in connection therewith," although this be less in width than one hundred feet. It is only in places where there may happen to be a greater width that the one hundred feet limitation has effect. As already pointed out, there is a historical reason for the adoption of this precise width. But, in any event, it is for the legislature to adopt such limitation as to it may seem reasonable for this purpose, and we are unable to perceive any sufficient ground for declaring it to be illusory.

It is argued that for the purpose of the distinction between first-class and second-class property the width of one hundred feet applies to canals as well as to railroads. Assuming this to be so, we do not think that the adoption of this limit of width for the waterway of a canal, in order to distinguish between first-class and second-class property, is so arbitrary as to demonstrate that the classification is illusory. Of course, canals, like railroads, are necessarily of limited width, and it is permissible for the legislature to adopt a width, any excess beyond which shall require a direct contribution, by way of tax, towards the support of local government.

It is strongly urged that at many points upon our principal lines of railroad, and more especially at their terminals, the roadbed actually occupied by tracks for the purposes of through traffic extends far beyond one hundred feet in width, and that there is no difference between the mode in which the strip called "main stem" is used and that in which the adjoining portions are used. It is pointed out that in the case of the Lehigh Valley railroad for miles at Jersey City, and at several other points, the railroad tracks cover the entire surface of the earth for several hundred feet in width, and are indistinguishable from each other by any physical marks; that they are all constantly used for railroad pur-

poses; that switches unite them, and they occupy the ground without any reference to whether it is main stem or adjacent property. And that in a great terminal station like that of the Pennsylvania railroad in Jersey City, some two hundred and fifty feet in width, a strip of land one hundred feet in width under the station is assessed as main stem by the state board, and the rest of the land and tracks under the station and the roof over the whole station, including main stem, are assessed by the local board of Jersey City. If the distinction between main stem and second-class property depended upon the use to which the property is devoted, these circumstances would possess much force. As already remarked, it does not depend upon that distinction, but rather upon the ground that by reason of the great extent and value of the railroad property at the points in question it is reasonable and proper that the railroad companies should contribute more largely to the cost of the local government than in other places where the amount of their property is less. Of course, all the property under consideration must be used for railroad or canal purposes, respectively, else it would not be in the principal class, and therefore not in either of the subdivisions.

Upon principle, therefore, as well as upon what we deem controlling authority, we are clearly of the opinion that the subdivision of railroad and canal property into two classes is based upon reasonable grounds that are fairly germane to the main purpose of imposing two separate and distinct taxes, one for strictly state uses at one rate upon one class, the other for local uses at local rates (either with or without a general state tax) upon the other class.

As amended in 1906, just as before those amendments, the act applies equally to all railroad and canal corporations, and treats all alike whose property is similarly circumstanced.

The law is therefore a general law.

But next it is insisted that the act of 1888, including the amendments in question, prescribes a rule for taxation which is not uniform within the meaning of our constitutional provision.

Now, with regard to the phrase "uniform rules," as used by

the constitution, we take it that two points are thoroughly established by the decision in 19 *Vroom,* as well as by abundant authority elsewhere. These are—*first,* the phrase does not refer to those regulations that pertain to the agencies and methods employed in the assessment and collection of taxes, but only to the basic rules for taxation—those that settle how the public burden is to be distributed, including the designation of the property that is to contribute, and the rate or ratio by which the taxes are to be laid and apportioned; and *second,* the constitutional provision is satisfied by a uniformity that obtains without discrimination throughout a class of property set apart on reasonable grounds for separate treatment.

These points are not much elaborated in the prevailing opinions in the Court of Errors and Appeals in the 19th *Vroom* case. They seem to have been taken for granted. Chancellor Runyon, however, touched upon the second point. At *p.* 279 he said: "The constitutional provision does not take away from the legislature the power of selecting the subjects of taxation. But it does require that all the members of the class selected shall be included in the Taxing law, and that the rule applied thereto shall be *uniform as to the whole of the class,"* &c. And at *p.* 282: . "A law which taxes a class of property separately is not unconstitutional if it embraces all property of that class, *and applies to it uniform rules,* and taxes it according to its true value." Justice Scudder (at *p.* 290), referring to the definition of the word "uniform," said: "As it stands in this paragraph of the constitution it means that rules must not be variable in their application to the subject of taxation *included in the classification of property."*

The extract above quoted from Justice Parker (19 *Vroom* 298) shows that he recognized the first point. As to the second, he said (at *p.* 304) : *"The uniformity of rules in taxation which the constitution requires is that uniformity which operates on the whole of a class."*

Justice Dixon (19 *Vroom,* at *p.* 310), referring to his own previous declaration in *Stratton* v. *Collins,* 14 *Id.* 562, that

the uniformity clause requires that the same imposition should be made upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes, said: "This statement, although sufficiently exact for the case then before the court, is broader than the constitution seems, on reflection, to demand. The expression 'uniform rules' is not of wider import than the expression 'general laws,' *and if the latter may be confined to a class, with equal propriety may the former.* * * * Its collocation with the words 'general laws' indicates that it was to have a corresponding meaning, and the whole sentence becomes harmonious by holding that it requires the same regulations to be applied to *every member of each class which the general laws recognize or establish.*"

Justice Reed's dissenting opinion shows that he had both points clearly in mind. At *p.* 322 he said: "Must property be taxed at a uniform rate by reason of the requirement that property shall be taxed by uniform rules as well as by general laws? The constitution does not require that property shall be taxed by a single rule, but by uniform rules. If we assent to the proposition that property may be ranged into classes for any purpose of taxation, and also to the proposition that a law which includes all of a class is a general law, *I am unable to perceive how a rule that also applies to a class lacks uniformity of operation.* Judicial sentiment has been in favor of the view that *the constitutional amendment was not intended to affect mere methods of procedure in levying or collecting taxes, but was designed to fix the rules by which the burden of taxation was to be distributed.* Inasmuch as all property to be taxed is to be taxed at its true value by the express terms of the amendment, if it is also held that all property must be taxed at a uniform rate, then the power of classification is a barren privilege."

And Mr. Justice Depue, in his dissenting opinion (19 *Vroom,* at *p.* 337), said, as to the first point: "The constitutional provision does not touch the machinery by which taxes shall be assessed or collected. Every system of taxation consists of two parts, the one relating to the assessment (the

designation of the persons or things which shall be the subject of taxation, and the apportionment of taxation among such persons or things in the ratio prescribed by law), the other the collection of taxes by the enforced payment thereof. The constitutional provision in question relates only to the assessment of taxes, and in that respect concerns only such equalization of the burden of taxation as would result from the designation of the property which shall be the subject of taxation, and the apportionment of the taxes thereon, under general laws and by uniform rules, according to its true value. The mere machinery by which taxes shall be assessed or collected is left in legislative discretion."

Both points were fully conceded by Chief Justice Beasley in 19 *Vroom* (at *p.* 8), for he used this language: "We perceive no reason why the legislature may not create different agencies for the valuation of property and the assessment of taxes. * * * Nor do we think the present law, in mere point of instrumentality, is objectionable. * * * *All that the constitution calls for in this particular is that the rule of assessment shall be uniform.* It does not require uniformity of mind in the application of the rule."

So, in *Fidelity Trust Co.* v. *Vogt, Receiver* (37 *Vroom,* at *p.* 90), Mr. Justice Van Syckel said: "Different methods of ascertaining true value may be prescribed in such classifications, and so long as the public burden is imposed substantially and proximately according to true value, there will be no infirmity in the declaration of the legislative will."

The cases cited below from the United States Supreme Court speak to the same effect.

If, therefore, the subdivision of railroad and canal property into two classes for the main purpose of determining the rate at which it is to be taxed and the purpose for which the tax is to be levied is justifiable (as we have seen that it is), clearly the two subdivisions may be separately treated with respect to the rules that have reference to the mere machinery of assessment, collection and enforcement of the taxes. This disposes of the objections that were urged against chapter 82 respecting matters of administrative detail. It also disposes

of the objection that under the Perkins act second-class property is assessed by the local assessors, while under chapter 82 "main stem" and "waterway" are assessed by a state board, with no equalization system to effect uniformity between the different assessments, and "no method of bringing into operation the same mind upon the values" (to use the words of counsel) without which, it is said there can be no uniformity. As well might it be said that there is no uniformity in the rules of law, because different judges sit in different courts and exercise different jurisdictions, sometimes dependent upon locality, sometimes dependent upon the form of the action. "True value" is the rule prescribed for the guidance of all tax assessors, and appeals and reviews are the method of correcting their errors.

For the same reason we find it unnecessary to determine the disputed question of construction above alluded to, viz., whether the Perkins act leaves second-class property still subject to the administrative features of the act of 1888, respecting the mode in which the assessments are to be reviewed, how payment of the taxes is to be enforced and the like; or whether in these and all other respects the Perkins act takes second-class property entirely without the scope of the act of 1888, and subjects it to the provisions of the General Tax law of 1903.

Counsel for the respondents seem prepared to concede that if the Perkins act has the latter effect, it is for this reason special, and, therefore, unconstitutional, because it relates to part only of the property used for railroad and canal purposes. Such a concession, we think, is unnecessary, for, as already seen, a justification of the classification for the main purpose of the act at the same time justifies the separate treatment of the two classes with respect to all matters of detail.

Nor are we prepared to concede the soundness of the argument of the same learned counsel that the title of the Perkins act is so restrictive as to prevent its provisions from having the effect of subjecting any part of the property used for railroad and canal purposes to the operation of the Tax law of 1903. The suggestion is that all property used for railroad

and canal purposes was taken out of the operation of the General Tax law of 1866 (predecessor of the revised act of 1903) by the acts of 1884 and 1888, so that after their enactment the act of 1866 had no relation to such property; that in the revision of the General Tax law in 1903 this kind of property was expressly exempted from its operation, and for this reason cannot be brought within it except by a supplement to the latter act; that the Perkins act is, by its title, a supplement to the act of 1884 as revised in 1888, and its title restricts its application to these acts, so that its provisions cannot extend the application of the act of 1903 to property used for railroad and canal purposes.

It is, of course, entirely established that under our constitutional provision (*art.* 4, § 7, *pl.* 4) that "every law shall embrace but one object, and that shall be expressed in the title," the title of a statute is not only an indication of the legislative intent, but is also a limitation upon the enacting part of the law. *Hendrickson* v. *Fries,* 16 *Vroom* 555, 563. But among the numerous reported cases in which our courts have been called upon to recognize and apply this doctrine, we are unaware of a case in which it has been held that an act which is, by its title, a supplement to a former act, is limited in its scope to provisions that are consistent with the *enacting part* of the act to which it is a supplement. On the contrary, acts entitled "supplements" are the means commonly employed by our legislature to modify and amend previous legislation.

The title of the act of 1884 is "An act for the taxation of railroad and canal property." The title of the act of 1888 is "An act to revise and amend 'An act for the taxation of railroad and canal property,' approved April tenth, one thousand eight hundred and eighty-four." The title of the Perkins act (*Pamph. L.* 1906, *p.* 571) is "A further supplement to an act entitled 'An act to revise and amend,'" &c. (repeating the title of the act of 1888). No reason occurs to us why this supplement may not constitutionally include any provision for the taxation of railroad and canal property. Supplements (if constitutional) are, on familiar principles, to be read into

the original act, and become in effect a part of it, and it would therefore seem that the "object" of a supplement, in the constitutional sense, is as broad as the object expressed in the title of the act to which it is a supplement. We find nothing in the reported cases which, when properly viewed, seems to hold otherwise. *New Brunswick* v. *Williamson,* 15 *Vroom* 165; 17 *Id.* 204; *Rahway Savings Institution* v. *Rahway,* 24 *Id.* 48; *Smith* v. *Howell,* 31 *Id.* 384 (see comment on this case in *Allison* v. *Corker,* 38 *Id.* 599, &c.); *Morris & Cummings Dredging Co.* v. *Jersey City,* 35 *Id.* 142; *Jones* v. *Morristown,* 37 *Id.* 488; *Walling* v. *Deckertown,* 35 *Id.* 203.

And as to the act of 1903, its title is "An act for the assessment and collection of taxes." There is nothing in this to exclude property used for railroad and canal purposes from the purview of the act. The exclusion arises solely from the *enacting part (Pamph. L.* 1903, *p.* 396, § 3, ¶ 8), which is, of course, amendable, not at all from the *title.*

However, the disputed question about the scope of the Perkins act is too important to be decided until the necessity arises, and we therefore leave it undecided.

But again, it is urged that the taxes imposed by virtue of the supplements of 1906 do not distribute the burden of taxation uniformly as between different railroad and canal companies, for two reasons. *First,* because second-class property must bear as many different rates of tax as there are taxing districts, so that one company may pay a higher rate, in the average, than its competitor whose second-class property lies in different taxing districts. But local rates necessarily depend upon local conditions, and the benefits of local government presumably vary in the like proportion. Railroad and canal companies are in this respect now placed upon the same footing with other taxpayers. *Secondly,* because the percentage of the entire property of each company that is within the second class varies as between different companies. It is pointed out that of the property of the Trenton and New Brunswick Railroad Company substantially all is "main stem," while of the property of the Long Dock Company

more than half is second-class property. If this is a valid objection, then, assuming a tax law levying one rate upon each horse and another rate upon each cow were in other respects valid, it would be rendered non-uniform, and therefore unconstitutional, by the circumstance that one man owned more horses than cows, while his neighbor owned more cows than horses. The point is treated in the extract already quoted from the opinion of Mr. Justice Scudder. 19 *Vroom* 291.

There is no substance in either of these points.

The laws in question "operate uniformly upon all property of the class." This is true of all property used for railroad or canal purposes, with respect to every rule that works a discrimination between such property and the remaining taxable property in the state. It is true of all property within each of the two subdivisions. All "main stem" and "waterway" property is treated alike. All other property used for railroad and canal purposes is treated alike, subject only to differences arising necessarily from differences in local conditions and government, differences which likewise affect all land taxation according to the location of the land.

Upon the whole, therefore, we entertain no doubt that the legislation of 1906 prescribes "uniform rules" for taxation, within the constitutional intendment.

Is the third of our constitutional requirements—the adoption of the standard of "true value"—excluded or rendered impossible of attainment by the necessary operation of this legislation? No more so, we think, than was the case with the previous legislation that has been judicially sustained.

The adoption of different agencies for making the valuations, with different supervision and review, certainly does not exclude it, for all agencies and tribunals are to be guided by the same standard.

Nor does the circumstance that, in such cases as are above instanced, main stem and second-class property constitute parts of an indistinguishable whole render it impossible, either from the legal or from the practical standpoint, for the assessing officers to arrive at a true valuation of the re-

spective portions of the property that is used for railroad purposes. No doubt if the state board of assessors on the one hand and the local assessors on the other hand were to value main stem and second-class property, respectively, without having regard to the environment of the property, absurd results would follow. The law, as we take it, contemplates no such thing. As remarked by the Chancellor in the case so often cited (*19 Vroom,* at *p.* 278) : "To do justice to the companies, and in common fairness, not only must the main stem of a railroad and the waterway of a canal be each valued and taxed as a unit, but the other property used in connection therewith and for the same purposes must also be valued and taxed with reference to such use. To make a just valuation thereof, property used for railroad or canal purposes must be estimated with regard to its value for such purposes. For example, the true value for purposes of taxation of railroad cuts and embankments and canal locks is not their cost, but what they are worth in connection with the works of which they form part." Clearly it is the duty of the state board to value main stem with reference to the adjacent property in connection with which it is used, and it is the duty of the local assessors to have in view the main stem when valuing the adjacent property. Although the problem is no doubt more difficult, it is essentially the same problem that confronts every local tax assessor when he comes to assess a portion of a lot, or of a farm, or of a house, of which the remaining portion lies in an adjacent taxing district. Indeed, any person, on properly valuing any specific parcel of land, must value it in connection with its environment. If it be a city lot he values it as a part of a city, and not merely as so much soil, so much clay, so much rock, &c.

Nor is the problem of valuing the roadbed separately from the superincumbent structure, and the structure separately from the roadbed, either novel or insoluble. It is a common and most usual practice for real estate experts, in computing the valuation of improved real estate of any kind, to estimate separately, first the land as it would be worth if vacant, and then the buildings and other improvements, and to combine

these estimates in order to arrive at the value of the whole. Such a separate valuation is contemplated by our General Tax law. *Pamph. L.* 1903, *p.* 395, § 3, ¶ 4; *Pamph. L.* 1903, *p.* 398, § 7; *Pamph. L.* 1906, *p.* 273. The whole business of insuring buildings against fire is based upon a valuation of them separate from the land. Litigations concerning the ownership of fixtures upon land frequently require their separate valuation while still *in situ.* Instance the Mechanics' Lien law. *Pamph. L.* 1898, *p.* 540, § 7. The Railroad Tax laws of 1884 and 1888, in section 3, as plainly required the valuation of structures separately from the land, and *vice versa,* as do the supplements of 1906, or any of them. And in 19 *Vroom* (at *p.* 292) Mr. Justice Scudder said: "The objection that the property of railroads by this law is not assessed according to its true value, because it can only be truly valued as an entirety, and not in parcels, as provided for in the act, is not well taken. The method of determining the true value of property must be left to the discretion of the legislature. If this value is fixed as the basis of taxation, the methods and the agencies to be used to ascertain it belong to the legislative, and not to the judicial, province." To the like objection, when raised in a later case, Chief Justice Beasley said: "This system of disjunctive valuations lies at the basis of this act. It could not be executed on any other plan. Consequently, when the act was vindicated on constitutional grounds the system thus essential to it was likewise vindicated." *Central Railroad Co.* v. *State Board of Assessors,* 20 *Vroom* 1, 7.

There is nothing, therefore, in the legislation before us that excludes—nothing, indeed, to interfere with—the standard of "true value."

Having settled the questions thus far discussed, by showing that the laws under consideration do not deprive the taxpayer of his property without due process of law, and that they comply with the mandate of our own constitution respecting the assessment of property for taxes, it follows that they do not deny to the prosecutors or any person "the equal protection of the laws." The "law," to whose equal protec-

tion they are entitled, is that very provision of our constitution which requires that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value." But the operation of this provision is of necessity subject to the right and power of the legislature to reasonably classify property for purposes of taxation. And the United States Supreme Court holds the same view declared by our own court of last resort, that rules which pertain uniformly to property rationally set apart in a class, irrespective of the ownership of such property, satisfy such a constitutional provision.

In *Kentucky Railroad Tax Cases,* 115 *U. S.* 321 (at *p.* 337), Mr. Justice Matthews said: "The rule of equality, in respect to the subject, only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances." And again, referring to the criticism that different modes of valuation and different procedure on appeal, existed as between railroad property and ordinary real estate, he said (at *p.* 338) : "We have already decided that the mode of valuing railroad property for taxation under this statute is due process of law. That being so, the provision securing the equal protection of the law does not require in any case an appeal, although it may be allowed in respect to other persons differently situated. This was expressly decided by this court in the case of *Missouri* v. *Lewis,* 101 *U. S.* 22, 30. It was there said by Mr. Justice Bradley, delivering the opinion of the court and speaking to this point, that 'The last restriction, as to the equal protection of the laws, is not violated by any diversity in the jurisdiction of the several courts as to subject-matter, amount or finality of decision, if all persons within the territorial limits of their respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress.' The right to classify railroad property as a separate class for purposes of taxation grows out of the inherent nature of the property and the discretion vested by the constitution of the state in its legislature, and necessarily

156     NEW JERSEY SUPREME COURT.

Central R. R. Co. of N. J. v. State Bd. Assessors.   75 N. J. L.

involves the right, on its part, to devise and carry into effect a distinct scheme with different tribunals in the proceeding to value it. If such a scheme is due process of law, the details in which it differs from the mode of valuing other descriptions and classes of property cannot be considered as a denial of the equal protection of the laws."

In *Pittsburg, &c., Railway Co.* v. *Backus,* 154 *U. S.* 421 (at *p.* 427), Mr. Justice Brewer said: "Equally fallacious is the contention that, because to the ordinary taxpayer there is allowed not merely one hearing before the county officials, but also a right of appeal with a second hearing before the state board, while only the one hearing before the latter board is given to railroad companies in respect to their property, therefore the latter are denied the equal protection of the laws. If a single hearing is not due process, doubling it will not make it so, and the power of a state to make classifications in judicial or administrative proceedings carries with it the right to make such a classification as will give to parties belonging to one class two hearings before their rights are finally determined, and to parties belonging to a different class only a single hearing."

*Winona and St. Peter Land Co.* v. *Minnesota,* 159 *U. S.* 526, is a strong authority upon the point now under consideration, for the reason that the state law there under review based a classification of property for purposes of taxation upon the mere circumstance that it had been omitted from the tax-roll in some preceding year or years, and the law established a different procedure with respect to this class of property from that which obtained respecting property in general. At *p.* 538 Mr. Justice Brewer said: "With respect to the next inquiry, it is true there is a difference in the mode of assessment. * * * In the one case there is an assessment by one officer with a right to review his action; in the other there is an assessment by a different officer, and no provision for a review except as the matter comes before the court in the proceedings for the collection of taxes. But there is nothing in this difference to affect the constitutional rights of a party. The legislature may authorize different modes of

assessment for different properties, provided the rule of assessment is the same." Citing the cases from 115 *U. S.* and 145 *Id.,* above mentioned.

See, also, *Bell's Gap Railroad Co.* v. *Pennsylvania,* 134 *U. S.* 232, 237, 238; *Home Insurance Co.* v. *New York, Id.* 594, 606; *Pacific Express Co.* v. *Seibert,* 142 *Id.* 339, 351; *Adams Express ·Co.* v. *Ohio,* 165 *Id.* 194, 228; *S. C.* on rehearing, 166 *Id.* 185.

*Weyerhaueser* v. *Minnesota,* 176 *U. S.* 550, sustained a statute which authorized the governor of the state to appoint a board to revalue and reassess property that had been grossly undervalued by the assessors for any county. *Winona and St. Peter Land Co.* v. *Minnesota,* 159 *Id.* 526, was relied upon and followed, Mr. Justice McKenna (176 *Id.,* at *p.* 557), reiterating the declaration that there was nothing in the difference in the manner of assessment, and the successive opportunities for review given to the property owner in the one case and not in the other, to affect the constitutional rights of a party, and that the legislature may authorize different modes of assessment for different properties, providing the rule of assessment is the same.

The taxes under review should be affirmed, with costs.