## WEST SHORE RAILROAD COMPANY v. STATE BOARD OF ASSESSORS.

Submitted July 6, 1911—Decided November 3, 1911.

1. In determining the value of the franchise of an interstate railway for purposes of taxation, the value of the franchise of the railway as a whole is to be determined by deducting from the value of the capital stock and outstanding securities, the value of the tangible property according to the rule in *Central Railroad* v. *State Board of Assessors*, 20 *Vroom* 1, and where the value of the different parts of the road is substantially in proportion to mileage, the franchise within this state may be valued at such a proportion of the total franchise value as the mileage in this state bears to the total mileage.
2. Boats owned by a foreign corporation and having no permanent *situs* in this state, are taxable at the domicile of the foreign owner and not in this state.

On *certiorari*.

Before Justices SWAYZE and BERGEN.

For the prosecutors, *Vredenburgh, Wall & Carey.*

For the defendants, *John R. Hardin.*

The opinion of the court was delivered by

SWAYZE, J. The prosecutor complains of the valuation of its franchise and of the assessment to the West Shore Railroad

Company of four ferry-boats and five car floats owned by the New York Central Railroad Company and taxed in New York.

The railroad extends from Weehawken to Buffalo, a distance of four hundred and twenty-four miles, of which only nineteen and three hundred and seventy-four thousandths are in New Jersey. It is leased to the New York Central and Hudson River Railroad Company for four hundred and seventy-five years from 1885, with the privilege of a further term of five hundred years. The rental is the amount of the interest at four per cent. on $50,000,000 of mortgage bonds which are guaranteed by the lessee. The lessee owns the entire capital stock, amounting to $10,000,000, and has a claim for $8,000,000 for advances. The bonds sell at about par, and, although there is no market for the stock, there is no proof that it is worth less than par, or that the railroad is not good also for the $8,000,000 floating indebtedness. The West Shore railroad is carried on the books of the New York Central at $68,000,000. We must assume that to be its value. The rule approved by this court in *Central Railroad Co.* v. *State Board of Assessors*, 20 *Vroom* 1 (at *p.* 9), for ascertaining the value of the franchise is to take the market value of the stock, add the value of the debts of the company, and deduct from the sum the value of the tangible corporate property. The property of the railroad in that case lay entirely, or almost entirely, within the state. In this case most of the property of the railroad lies outside the state. The United States Supreme Court has approved a method of taxation in such a case that treats the railroad within and without the taxing state as a whole, as, in fact, it is, and distributes the value, including the value of the franchise, in proportion to the mileage within each state. *Pittsburgh, &c., Railroad Co.* v. *Backus,* 154 *U. S.* 421; *Cleveland, &c., Railway Co.* v. *Backus, Id.* 439. And the same method has been approved for apportioning taxes among different counties in the same state. *State Railroad Tax Cases,* 92 *Id.* 575; *Columbus Southern Railway* v. *Wright,* 151 *Id.* 470 (at *pp.* 479, 480). A similar method has been approved in the case of telegraph companies. *Western Union Telegraph*

*Co.* v. *Massachusetts,* 125 *Id.* 530; *Postal Telegraph and Cable Co.* v. *Adams,* 155 *Id.* 688; *Western Union Telegraph Co.* v. *Taggart,* 163 *Id.* 1; even in a case where the franchise of a corporation was created by another state and it derived some of its privileges from an act of congress. *Western Union Telegraph Co.* v. *Gottlieb,* 190 *Id.* 412. The same rule has been applied to parlor car companies. *Pullman Car Co.* v. *Pennsylvania,* 141 *Id.* 18. The express company cases involved an analogous question, but went much further in sustaining the state's power to fix valuations on the property of a foreign corporation within the state with regard to the value of its property as a whole, whether within or without the state. *Adams Express Co.* v. *Ohio,* 165 *Id.* 194; 166 *Id.* 185; *Adams Express Co.* v. *Kentucky, Id.* 171. The mileage proportion rule is subject to modification where the value of the different parts of the road is not substantially in proportion to mileage. This was recognized in the Indiana cases in 154 *Id.* above cited, and has been recently affirmed in *Fargo* v. *Hart,* 193 *Id.* 490. In the present case there is nothing to show that the total value of the railroad is enhanced out of proportion to the mileage by the value of the property in New York, so that a distribution based on mileage would give New Jersey the benefit of taxing the value of property outside our own jurisdiction. As far as the evidence enables us to judge, the contrary is the case. It is probable that the value of the Weehawken terminal on the Hudson river opposite the city of New York and within this state is so great that a distribution of the valuation between the two states in proportion to mileage would give New York the advantage of including in the valuation of the portion of the railroad within that state a part of the value of this great terminal. We think, therefore, that a fair method of ascertaining the taxable valuation of the franchise in this case is to deduct the value of the tangible property from the value of the capital stock and of the securities representing the debts (mortgage bonds and floating debt), and to fix the value of the New Jersey franchise at such a proportion of the remainder as the mileage in New Jersey bears to the total mileage.

The value of the tangible property in New Jersey is $9,196,-058. The only evidence we have of the value of the tangible property outside of New Jersey is a statement furnished by the prosecutor, that its assessed valuation is $10,864,083. In the absence of proof to the contrary, we must assume this to be the market value, although it seems probable that it is too low, as it amounts to less than $27,000 per mile. The total tangible property upon these figures is $20,060,141. After deducting this from $68,000,000, the value of the capital stock and securities, there remains a balance of $47,939,859, which represents the adventitious value of the value of the franchise. If this is distributed in proportion to the mileage, the portion attributable to the nineteen and three hundred and seventy-four thousandths miles in New Jersey is $2,190,534. This exceeds by $300,000 the valuation of the state board of assessors. This difference may be due to the fact that they have deducted the floating debt from the total valuation or have made some allowance, because, in their judgment, the franchise or adventitious value of the portion in New Jersey is a less proportion of the whole than the mileage in New Jersey is of the whole mileage. The statute authorizes the board of assessors to use their personal knowledge and judgment, and, as we have said in Central Railroad v. State Board of Assessors, already cited, we ought not to set aside their judgment unless for palpable error.

It is urged, however, that the railroad company is entitled to net a fair return on its investment, and we are referred to decisions of the United States Supreme Court in rate cases. It has, we think, never been decided that a railroad company was entitled under whatever circumstances and at all events to a reasonable return on its investment. On the contrary, the courts have recognized that the mere failure to produce a profit is not of itself conclusive evidence that a rate is unreasonable, for the road may have been built in advance of the public needs, at an extravagant cost and it may be run in a wasteful manner. Considerations of this kind are suggested in *Reagan v. Mercantile Trust Co.,* 154 *U. S.* 362 (at *p.* 412). Even, if this were a rate case, we should have to go into the inquiries

that have become familiar in those cases, for the determination of which this case presents no evidence. It is clear that the railroad company earns, at least for the holders of its bonds, a net revenue of $2,000,000 a year, and bids fair to earn that for centuries to come. We need not pursue the subject since this is not a rate case, but a tax case. We have heretofore found no suggestion that a property owner should be excused from the payment of taxes on the proper valuation of his property because he was unable to use it to advantage and with profit. The answer ordinarily is that if the property is worth the money, it is because someone can, or thinks he can, make it produce a profit on the valuation. A similar argument was made in the *State Railroad Tax Cases,* 92 *Id.* 575. It is stated and answered by Mr. Justice Miller. Referring to the case of one of the companies he says: "That company is insolvent and in the hands of a receiver. It is unable to pay any interest on its bonds. Its capital stock is of no value. But the board of equalization assessed the capital stock and franchises at $2,003,415, and its tangible property at $2,629,367, thus assessing a property which pays but little, if anything, beyond its running expenses at the sum of $4,632,782." "Concede for the present that the capital stock is sunk and is of no value; concede that the funded debt of the company has at present no market value or is unsalable; there remains what is valued as worth over $2,600,000 of real and personal property, which, like all other property of individuals or corporations, ought to pay its proportion of the public burdens. There also remains the value of the franchise, which is not destroyed by the circumstance that the road does not pay interest on its debt. Does anybody believe that this debt is of no value; that the holders of it attach no value to this franchise? Are they willing to give up the right to operate the road, to receive freights and fares, to endeavor to make it pay something more than the mere value of the personal property, of the track, the depots, the grounds, the rolling stock and other tangible property? Is it supposed by anyone that they intend or ever will sell these separately or apart from the right to use them as a railroad? Why do not the bondholders sell all these things under their

mortgage at auction as a man would sell town lots and household furniture and horses and carriages? The reason is too clear to escape observation. It is because in the case of the railroad there is attached to all this property, and goes with it a privilege, a right to use it through the whole extent of the richest counties of Illinois, in transporting persons and property, in a manner which adds immensely to its value when considered as so much iron, so much land and so much personal property. By virtue of this privilege or franchise, this is all aggregated into a unit, well adapted to make money by its use in that way, with a chartered right to use it for that purpose."

We are not impressed by the figures of receipts and cost of traffic presented by the prosecutor. It may well be that the earning power of the nineteen miles in New Jersey may be small considered by itself, but that by no means measures the value of the franchise for a railroad connecting the four hundred and four miles north of our state line with tidewater opposite New York City. We can form some idea of the value of the New Jersey franchise if we think of the difference between the value of a railroad from Buffalo to Tappan without an outlet and the value of the same road with the outlet which the New Jersey franchise gives. Even in rate cases, it is held that it is not necessary that every mile of the road should show a profit. *St. Louis and Santa Fe Railway* v. *Gill,* 156 *U. S.* 649. The railroad must be considered as a whole. This road is leased to and controlled by the New York Central and Hudson River railroad, and the two roads are parallel and within a few miles of each other for their entire length. No doubt, as the prosecutor's brief says, the West Shore is "practically a side track for the accommodation of the surplus freight of the New York Central and Hudson River railroad." Whether it could be made more profitable if used to the same advantage as the New York Central lines, we do not know, but certainly it is within the bounds of probability that the lessee company may use this so-called "side track" for the least remunerative business, and reserve for its own lines the more profitable. This is conjecture; we know that the lessee was willing to pay a rental of $2,000,000 per annum and to agree to pay that sum

for four hundred and seventy-five years. A property producing such a rental, guaranteed for so long a period, is a very valuable property, and a large part of that value is due to the franchise to run a railroad from Tappan to Weehawken.

The argument that the franchise of the prosecutor is not taxed by a uniform rule with the franchise of other roads because the West Shore running through a sparsely settled country is assessed at $95,000 per mile, while the Central of New Jersey and the Pennsylvania running through a thickly settled portion of the state are assessed at much less per mile, has a deceptive plausibility. It overlooks the fact that the great value of the Weehawken terminal is distributed by this calculation over nineteen miles of road only, while the value of the terminals of the other roads is distributed over perhaps a hundred or more miles. If two roads have terminals of equal value, and one has five times the mileage of the other, a valuation of a mile of the shorter road must greatly exceed a similar valuation of a mile of the longer road. If the value thus put upon the New Jersey franchise is too high, it is probably because the valuation of the property in New York is too low and the balance representing the franchise or adventitious value is thus unduly enhanced. It was for the railroad company, however, to make proof of this fact, and in the absence of such proof, we can determine the value upon the evidence before us only.

We think the prosecutor has failed to show that the valuation of the franchise is excessive.

As to the ferry-boats and floats, we think the state board erred. They were not the property of the West Shore railroad, but of the New York Central, and had no permanent *situs* in New Jersey. They were, therefore, taxable to the owner at its domicile. *Ayer & Lord Co.* v. *Kentucky,* 202 *U. S.* 409; *American Mail Steamship Co.* v. *Crowell,* 47 *Vroom* 54. To that extent the assessment should be corrected.