STATE BOARD OF TAX APPEALS.

THE CENTRAL RAILROAD OF NEW JERSEY, LEHIGH
VALLEY RAILROAD COMPANY, DELAWARE, LACKA-
WANNA AND WESTERN RAILROAD COMPANY, ERIE
RAILROAD COMPANY AND THE TRUSTEES OF ITS
PROPERTY, NEW YORK CENTRAL RAILROAD COM-
PANY, NEW YORK, SUSQUEHANNA AND WESTERN
RAILROAD COMPANY AND THE TRUSTEES OF ITS
PROPERTY, READING COMPANY, NEW YORK AND
LONG BRANCH RAILROAD COMPANY, NEW JERSEY
AND NEW YORK RAILROAD COMPANY AND THE TRUS-
TEES OF ITS PROPERTY, PETITIONERS, v. J. H.
THAYER MARTIN, STATE TAX COMMISSIONER, RE-
SPONDENT.

Decided May 13, 1941.

For the petitioners, *Maximilian M. Stallman* and *Robert J. Bain.*

For the respondents, *David T. Wilentz,* Attorney-General, *Duane E. Minard* and *Charles V. Webb, Jr.*

Quinn, President. The appeals represented in the foregoing caption are brought on behalf of the railroad systems named, and of the separately assessed individual companies, aggregating sixty-six in number, which they operate through stock control, lease, or otherwise. The assessments sought to be reviewed were made by respondent upon the railroad properties operated in this state by those systems, for the tax years 1937 and 1938, determined as of the assessing dates fixed in the controlling statutes, January 1st, 1936, and January 1st, 1937, respectively. *Pamph. L.* 1888, *ch.* 208, as supplemented and amended (*R. S.* 54:19-1, *et seq.; N. J. S. A.* 54:19-1, *et seq.,* through *R. S.* 54:29-7; *N. J. S. A.* 54:29-7).

The major contentions of the railroads are, (1) that the valuations and assessments were made arbitrarily and are greatly in excess of the true value of the properties, and therefore are in violation of the constitution and laws of New Jersey (which provide that property shall be assessed for taxes according to its true value), and deprive the companies of their property without due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States; and (2) that the valuations and assessments were made at a relatively higher ratio to the true values of the properties of the companies than the ratio to true value at which the properties of other taxpayers generally throughout the state were assessed for taxes for the same years, and therefore that the assessments of the companies' properties are in violation of article IV, section VII, paragraph 12 of the Con-

stitution of New Jersey, which provides that property shall be assessed for taxes under general laws and by uniform rules according to its true value, and deny the companies the equal protection of the law, in violation of the Fourteenth Amendment of the Constitution of the United States.

Subsidiary questions are raised with respect to the validity of certain practices of the State Tax Department in the mechanics of valuation, primarily as to the following: (a) the determination of the value of land in railroad use by the criterion of the value of adjacent lands not used for railroad purposes; (b) in determining the value of lands by first fixing their value as ordinary lands not fitted or conditioned for railroad use, and then adding thereto elements of cost involved in such conditioning, such as grading, clearing, erection of retaining walls, &c.; (c) in valuing and assessing as railroad property structures designed to protect the traveling public at grade crossings, such as overhead bridges, abutments, gates and signs; (d) the valuation and assessment, as against the Delaware, Lackawanna and Western Railroad Company, of active floating equipment of that company, claimed by it not to have a *situs* for taxation in this state.

Although the statutory scheme for the assessment of railroad property in this state has been the subject of frequent exposition in prior judicial opinions disposing of appeals for prior years by these companies in both the state and federal courts, as well as by this board, it becomes advisable briefly to review the relevant statutes, in view of the contention here urged by the railroads to the effect that the essential issues are not concluded by earlier adjudications, because of the presentation of expert testimony in these cases as to railroad true value, and as to the correct method for its determination.

Under section 3 of the act (*Pamph. L.* 1888, *ch.* 208, *p.* 270; *Comp. Stat., p.* 5264; *R. S.* 54:22-1; *N. J. S. A.* 54:22-1) the State Tax Commissioner is directed to ascertain the true value of all property used for railroad purposes, including franchises. No specific directions are provided by the statute as guiding criteria for use by the commissioner in arriving at such true value, but he is directed expressly to ascertain:

I. The length and value of the main stem of each railroad.

II. The value of the other real estate used for railroad purposes in each taxing district, including the roadbed (other than main stem) waterways, reservoirs, tracks, buildings, water tanks, waterworks, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad purposes.

III. The value of all the tangible personal property of each railroad.

IV. The value of the remaining property, including the franchise.

The commissioner is further directed to serve upon each company a statement of the assessed valuation of the property of such company in the state, and of the separate valuation of the property of such company in each taxing district.

To aid him in performing his statutory function of fixing the true values of the four classes of property created by the act, the roads are required, annually, to make returns of statements or schedules, showing:

(a) The real estate, specifying its extent and dimensions, setting out in detail the total length of the road including branch and leased lines, the entire length in this state, and the length of double or side tracks, designating the length and value of the main stem of each railroad, and of the waterway of each canal, and the length of such main stem and waterway in each taxing district, and the width wherever it exceeds one hundred feet, and designating particularly any portion in each taxing district which is not used for railroad purposes and which is locally assessed and taxed, and the value thereof;

(b) The real estate and number, character and value of all buildings and structures in each county and taxing district used for railroad or canal purposes, including the roadbed (other than main stem), waterways, reservoirs, tracks, buildings, water tanks, waterworks, riparian rights, docks, wharves and piers, and being the property referred to in subdivision II of section 54:22-1 of this title;

(c) The character and value of all the tangible personal property used by it for railroad and canal purposes;

(d) The amount of capital stock authorized and the number of shares into which such capital stock is divided.

*Pamph. L.* 1905, *ch.* 91, § 1 (*R. S.* 54:23-1; *N. J. S. A.* 54:23-1).

These statements are required to be made on forms prescribed by the commissioner. Such reports have not been filed by the petitioners for the years in question.

The act provides for a full and detailed procedure for the hearing and review by the commissioner of any complaints by any railroad company with respect to assessments of railroad property made by him, and in the course of such review, it is specifically provided that he "shall be entitled to use his *personal knowledge and judgment as to the value of property.*" (Underscoring supplied). *Pamph. L.* 1888, *ch.* 208, *p.* 276, § 12, as amended by *Pamph. L.* 1933, *ch.* 11, *p.* 23, § 1, and *Pamph. L.* 1933, *ch.* 305, *p.* 819, § 1.

In the instant cases all of the petitioners availed themselves of the right of preliminary review, and these appeals are from the commissioner's final determinations.

Although the hearings in these matters resulted in the accumulation of a stenographic record of 4,610 pages of testimony, and the production of some 450 separate exhibits, a careful review of the cases in their entirety elicits one major and decisive issue: Have petitioners overcome the presumption of correctness which must be deemed to attend the valuations made by the State Tax Commissioner, as assessor, particularly in the light of the prior tax litigation maintained by these railroad companies since 1933?

The underlying and fundamental complaint of the companies is that the valuations fixed by the commissioner are arrived at in complete disregard, and without any material reflection, of the earning capacities of the railroads as business enterprises. They purport to show that whereas the State Tax Department recognizes that functional depreciation should be taken into account in fixing true value of railroad properties, yet radical decline in both gross revenues and net operating revenues of these petitioners has not found appreciable correlative reaction in the form of reduced assessed valuations of their properties. In support of their views they

offer a great mass of statistical material pertaining to the amount and character of their business, both quantitatively and in terms of dollars, for a period of years prior to the tax years in question, and they adduce *a priori* estimates by two competent utility valuations experts as to what, *in their judgment,* those parts of the petitioner railroad systems which are situated in New Jersey would be worth, as between the mythical willing buyer and willing seller, upon the assessing dates.

These witnesses are offered by the railroads as presenting new and hitherto unconsidered *evidential material* on the subject of true value of New Jersey railroad properties. We have concluded that they are, on the contrary, merely apologists of a *different method and theory* of railroad valuation. The New Jersey railroad tax statutes, however, illumined by their practical administration at the hands of the State Tax Commissioner, without legislative interference over a period of half a century, vest an authoritative, though not conclusive, status in this *peculiar knowledge and judgment* in the matter. No such authority can attend the theories of the railroad experts, conceding their eminent qualifications in the scholarship of utility appraisal, for general purposes. These conclusions have been arrived at by us upon a study of the relevent recent tax litigation, an examination of the testimony of the railroad experts as well as that of the commissioner and his chief engineer in charge of railroad assessments, and of the history of railroad operations and revenues, as contrasted with assessments, since 1932. We consider these matters in that order.

The early history of the several railroad tax statutes and of the judicial interpretations of the law has been admirably set out by Professor Harley L. Lutz in his treatise, *The Taxation of Railroads in New Jersey* (1940, Princeton University Press), *pp.* 4-42. The details of that history prior to 1933 are not decisive of the immediate issue before us, since the assessments for that year resulted in a decision by the Supreme Court, which, in its completeness and its full responsiveness to the major contentions urged by the railroads in the instant cases, must be our primary guide post. *Central Railroad Co.* v. *Thayer Martin (Supreme Court,* 1934), 114

*N. J. L.* 69; 175 *Atl. Rep.* 637. For present purposes, it will suffice to review the earlier development of the law in brief. The fourfold class division of railroad property for assessment purposes found in the present law flows from *Pamph. L.* 1884, *ch.* 101, as broadly revised by *Pamph. L.* 1888, *ch.* 208. The separation of property into classes was sustained as constitutional in *State Board of Assessors* v. *Central Railroad of New Jersey (Court of Errors and Appeals,* 1886), 48 *N. J. L.* 146; 4 *Atl. Rep.* 578. The delegation by the legislature to an administrative board of the function of selecting methods for the ascertainment of the true value of the separate classes of railroad property was likewise sustained. Later attempts to attack the legislative plan for valuation of railroad property in classes rather than as entire operating units, were similarly repulsed. *Central Railroad Co.* v. *State Board of Assessors (Supreme Court,* 1886), 49 *N. J. L.* 1; 7 *Atl. Rep.* 306; *Central Railroad Co.* v. *State Board of Assessors (Supreme Court.* 1907), 75 *N. J. L.* 120; 67 *Atl. Rep.* 672.

Emphasis was early laid upon the legislative reliance upon the personal knowledge and judgment of the assessors. In the decision of the court passing upon the act of 1884, 49 *N. J. L.* 1, the opinion states:

"* * * it is not to be overlooked that the statute in question expressly declares that these assessors 'shall be entitled to use their personal knowledge and judgment as to the value of the property,' a capacity with which this court is not endowed by the legislature."

The personal knowledge and judgment thus referred to became crystallized in an assessing methodology which was based upon a physical appraisal, piecemeal, of each of the separate components entering into the makeup of the property in classes I, II and III, with the earnings factor relegated to a place, along with the value of the bonds and stock of a company, in determining the value of class IV property, the franchise. See Report of Chandler W. Riker, chairman, in *Report of the New Jersey Tax Commission,* 1905, *p.* 102. Although the present State Tax Commissioner and his chief engineer in charge of railroad property assessments, testify

that functional depreciation is applied as a factor in the valuation process, and that any sufficiently long continued decline in earning capacity of a railroad should and does enter into a determination of the extent of its functional depreciation, we are satisfied that under the historical practice of the several state boards of assessment, and of the Tax Department since its establishment in 1931, no great degree of attention has been paid to the earnings factor, so far as classes I, II and III are concerned. This, we think, was so when railroad earnings boomed, as well as during the period of sharp decline from 1926 to 1932. See Report of Charles Hansel, on *Revaluation of Railroads and Canals in New Jersey* (1911). During the entire period referred to, the legislature has refrained from any interference with the administrative application of the law, other than in the treatment of grade crossing eliminations as an element of cost, by *Pamph. L.* 1931, *ch.* 227, referred to hereinbelow.

As heretofore indicated, the controlling adjudication in these matters is the case of *Central Railroad Co.* v. *Thayer Marlin (Supreme Court,* 1934), 114 *N. J. L.* 69; 175 *Atl. Rep.* 637, in which the court reviewed appeals by all of the railroads of the state, excepting the New York and Long Branch Railroad Company, from assessments upon railroad property made by the State Tax Commissioner for the year 1933. The major contentions of the companies in that case were substantially the same as those here made, *i. e.,* (1) illegality of the method by which the assessments were made; (2) regardless of the method of assessment, the property was assessed in excess of its true value; and (3) that the great mass of real estate taxable under the General Tax Act is assessed at less than true value, and that properties of railroad companies, being assessed at true value, are thereby discriminated against. After referring to the findings of this board, the court said (at *p.* 73) :

"The proof is clear that the provisions of the statute have been observed. Mr. Louis Focht, a civil engineer since 1884, has been identified with the branch of the state department in charge of the detail work incident to the making of the assessments since 1898; he is the chief engineer of the divi-

sion of railroad valuation and taxes; he was formerly employed by the Lehigh Valley Railroad Company of New Jersey for about sixteen years as a division engineer; and he has walked every foot of railroad in this state. He was called and testified as a witness for the prosecutors and respondents. He said that the method employed in the making of the instant assessments, and herein complained of, is the method that has been employed in this state since 1884. This is the first time that an attack has been centered and directed against it."

The court further quoted, with approval, from the opinion rendered by this board, as follows (*pp.* 74, 75):

"The statute does not prescribe any specific method for determining true value. It is obvious, however, that it contemplates a physical valuation of each class of railroad property. The method of determining true value is left in the discretion and judgment of the State Tax Commissioner.

"The true value of railroad property is not determined solely by cost of acquisition of land, by cost of improvements and personal property, less depreciation, or reproduction cost less depreciation, but is based upon a consideration of many elements, such as the statutory returns made by railroad companies showing the cost and true value of their property as determined by them, a personal examination and investigation of the property, consideration of its physical conditions, usability and location and its proximity to large cities for transportation of freight and passengers and to industrial manufacturing and mining centers, pleasure resorts and ocean and river termini. In valuing structures and tangible personal property, additional elements are frequently considered, namely; cost, or reproduction cost, less depreciation, obsolescence and other elements not reflected in the physical value. All these elements are considered in connection with the railroad as a going concern.

"For the respondents it is strongly urged in substance, that the methods followed and the factors considered, as indicated, are basically, traditionally and legally sound; they are productive of the 'true value' of the prosecutors' properties. This, we think, is so."

The court then referred to the assertion that the true value of a railroad should be determined by the market value of its stocks and bonds representing its property, or by its earnings, or by a combination of both, over a period of years, and that the assessments then before the court were erroneous in that they disregarded these factors. The effect of the court's response to the contention thus urged by the railroads can be fully appreciated only by considering the actual figures reflecting the degree of failure of correlation between trends of earnings and of assessments of the major systems for a period of years prior to the tax year 1933, with which year the court was there concerned. These tables are illustrative:

### DELAWARE, LACKAWANNA AND WESTERN RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1924 | $86,753,529 | 1926 | $73,527,897 |
| 1925 | 83,659,202 | 1927 | 75,468,565 |
| 1926 | 88,823,202 | 1928 | 76,526,743 |
| 1927 | 84,699,577 | 1929 | 77,948,242 |
| 1928 | 81,138,442 | 1930 | 79,497,856 |
| 1929 | 81,743,222 | 1931 | 82,137,269 |
| 1930 | 69,661,490 | 1932 | 85,677,586 |
| 1931 | 58,674,838 | 1933 | 85,836,862 |

### LEHIGH VALLEY RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1926 | $80,453,150 | 1928 | $41,294,624 |
| 1927 | 74,502,819 | 1929 | 41,898,848 |
| 1928 | 71,935,071 | 1930 | 44,765,010 |
| 1929 | 71,722,735 | 1931 | 46,596,877 |
| 1930 | 60,664,188 | 1932 | 46,351,532 |
| 1931 | 50,024,627 | 1933 | 45,694,813 |

## Erie Railroad

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1924 .... | $105,042,224 | 1926 .... | $40,746,423 |
| 1925 ..... | 104,252,181 | 1927 ..... | 41,989,343 |
| 1926 . . . | 110,574,019 | 1928 ...... | 44,424,109 |
| 1927 .. . | 108,357,165 | 1929 . .... | 46,511,317 |
| 1928 ... .. | 110,091,920 | 1930 . .... | 47,269,237 |
| 1929 .. . | 113,610,598 | 1931 ... . | 48,507,412 |
| 1930 . .. | 95,372,547 | 1932 . .... | 48,410,772 |
| 1931 . .... | 79,227,205 | 1933 .... . | 49,194,482 |

## Central Railroad of New Jersey

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1923 . . | $55,478,125 | 1925 . . . | $92,423,194 |
| 1924 .... | 53,652,580 | 1926 . . | 92,949,912 |
| 1925 . . . | 53,161,021 | 1927 . . . | 97,022,887 |
| 1926 . | 58,123,744 | 1928 ..... | 102,132,397 |
| 1927 .... | 56,812,453 | 1929 . ... | 102,957,694 |
| 1928 ... . | 56,147,270 | 1930 .. . | 105,218,047 |
| 1929 .. .. | 56,302,198 | 1931 .. . | 104,837,338 |
| 1930 . | 50,092,802 | 1932 ...... | 104,061,272 |
| 1931 ... | 38,243,100 | 1933 .... | 102,351,077 |

## New York Central Railroad

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1924 ..... | $552,156,569 | 1926 . . | $23,882,604 |
| 1925 . . . | 577,647,802 | 1927 . . .. | 24,833,053 |
| 1926 . . | 597,564,113 | 1928 .... | 26,665,844 |
| 1927 .... . | 572,030,511 | 1929 . .. | 27,575,331 |
| 1928 . .... | 570,169,610 | 1930 . .... | 28,801,821 |
| 1929 .... | 590,008,624 | 1931 . .... | 29,811,955 |
| 1930 .. | 478,918,348 | 1932 . .. | 30,057,632 |
| 1931 ..... . | 382,190,183 | 1933 ...... | 30,910,862 |

Despite the clearly defined issue thus drawn as to the extent to which the Tax Department had disregarded the earnings factor, the court was able to dispose of the showing thus made with these conclusions (*p.* 78) :

"The board, as stated in its opinion, clearly set forth the method employed and the various factors which it considered in reaching its conclusions. If we are at all concerned with the method or formulas so employed, as long as the sum it declared be due is based on the true value of prosecutors' properties (*Central Railroad Co.* v. *State Board of Assessors,* 49 *N. J. L.* 1, at *p.* 8), we are of the opinion that the methods employed and the factors considered by the board were fairly inclusive; they were sound, fair and reasonable. It appears to us that they truly form, under the proofs herein submitted, a practical, sound, fair and legal basis for the result reached. The practical construction given to the law by the board for nearly half a century on which it reached its conclusions is strong evidence that it is right. It has become the firmly rooted, established and fixed law applicable thereto. It cannot, under these circumstances, be changed by or through the judicial branch of our government. The relief, if any, prosecutors are entitled to have in the premises, must come, if at all, by or through the legislative branch of our government. This we think is the well settled law."

The court proceeded to cite a number of authorities dealing with the effect of legislative concurrence with a long-continued course of administrative construction of an act, and concluded that the assessments were neither excessive, nor satisfactorily proven to be discriminatory. The assessments made for the year 1933 were accordingly affirmed, and no further review thereof was sought by the railroads.

In due course, appeals were filed with this board by petitioners to review the 1934, 1935 and 1936 assessments, upon substantially the same grounds as those urged in the 1933 case, and as in the present appeals. For each year the assessments were sustained *in toto,* the issues being regarded as dependent upon the legality of the assessing method in use by the State Tax Commissioner, and therefore concluded by the decision of the Supreme Court in the 1933 case. *Central*

*Railroad Company of New Jersey et al.* v. *J. H. Thayer Martin, New Jersey Tax Reports* 1934-1939, *p.* 82 (1934 case) ; *Central Railroad Company of New Jersey et al.* v. *State Tax Commissioner, Id. p.* 231 (1935 case). The judgment in the 1936 case was without opinion.

Rebuffed in the state courts, the petitioners filed their bill of complaint in the United States District Court of New Jersey seeking to enjoin the collection by the state authorities of the claimed excess of the taxes assessed for the years 1934, 1935 and 1936 over what was alleged would be due were the assessments not unconstitutionally excessive. It was charged in those proceedings that the assessments as made were erroneous in principle, excessive, unduly discriminatory and illegal, and that they deprived the companies of their property without due process, contrary to the Fourteenth Amendment.

The federal trial court found no evidence of intentional discrimination by the state against the railroads, but did conclude that the methods of assessment were not productive of true value, that railroad lands were being valued on the same basis as adjacent land not used for railroad purposes, that structures were valued upon the basis of depreciated cost new, and that despite substantial decline in the earnings of the railroads during and preceding' the years in question, there was no showing of any reduction in assessments attributable to this decline. The court concluded that by reason of its findings aforementioned, the assessments were arbitrary, capricious, basically unsound, and so grossly excessive, as to amount to constructive fraud, and that the disregard of earnings in the valuation process was a denial of rights secured by the due process clause of the Fourteenth Amendment. *Central Railroad Company of New Jersey et al.* v. *Martin,* 30 *Fed. Supp.* 41. The court proceeded to enjoin the collection of more than 60% of the taxes due, pending a reassessment for the years contested by the state authorities. The percentage was increased to 70% by a supplemental memorandum.

Upon appeal taken by the state to the Third Circuit Court of Appeals, the decree of the District Court was reversed (C. C. A. 3d, November 27th, 1940). The court held that the only meritorious question presented by the bill was as to

whether a violation of the Fourteenth Amendment was shown. After stating that the practice of valuing railroad lands with reference to the value of adjoining lands, and railroad structures upon the basis of depreciated cost, without regard to earnings, did not raise a federal question, the court made this observation, significant as to the issues now before this board:

"We think it clear that these methods of valuation do conform to the New Jersey laws. They have been followed by the taxing authorities of that state for more than fifty years, and, as this court pointed out in *Lehigh Valley Railroad Company of New Jersey* v. *Martin,* 100 *Fed. Rep.* (*2d*) 1929 (which involved similar taxes of the plaintiffs for the years 1932 and 1933), 'have received the sanction of the courts of New Jersey and are now firmly imbedded in its laws.' "

Respecting the claim of the railroads that they were denied the equal protection of the laws because of discriminatory assessments against railroad property, that contention was held to have fallen with the finding of the District Court that no discrimination was shown to exist, the court observing, moreover, that even were there discrimination, it would not constitute a violation of the Fourteenth Amendment, because of the separate classification of railroad property under the New Jersey laws. The contention of the plaintiffs to the effect that there resulted, in consequence of the failure of the state assessors to give effect to declining earnings, an assessment so grossly excessive as to be unconstitutional, was rejected by the court upon the authority of *Nashville, C. and St. L. Railway* v. *Browning* (1940), 310 *U. S.* 362. There the United States Supreme Court held that mere overassessment or overvaluation by a state of railroad property did not offend the Fourteenth Amendment, if, as stated by Mr. Justice Frankfurter, "the needs of a state require higher taxes" (*p.* 370).

The Third Circuit finally considered the contention of the state to the effect that the same issues presented in the case before the court had been adjudicated by the New Jersey Supreme Court in the 1933 case, hereinabove discussed at length, and that the questions of legality and constitutionality

of *method of assessment* were *res judicata*. The court concluded that the plea of *res judicata* should have been sustained, in that the parties and issues were the same in each case.

The railroads contend that in these cases, this board is free to undertake a new approach to the question of a proper and legal method of determining the true value of railroad property, regardless of the adjudications of the courts referred to hereinabove (except the decision of the Third Circuit, entered after the filing of briefs herein), for the asserted reason that testimony was not introduced by the companies before the court, dealing with the method of valuing railroad property, whereas it is claimed that such testimony was offered in this case. It is asserted that the doctrine of *res judicata* is therefore not applicable, and the further implication in the argument is that the former decisions are not authoritative precedents. The testimony thus referred to as having been introduced in the pending cases, was that of the two valuation engineers, Messrs. Burpee and Merriman.

The essential basis of the valuation methods which these witnesses espoused as calculated to result in a fixing of the true value of the railroad properties in New Jersey, was that of determining the value of the respective systems as entireties, primarily upon a capitalization of their earnings and a valuation of their stocks and bonds, averaged over fixed periods of time in both cases, and then of allocating a value to the New Jersey portion of the whole, upon the basis of a formula of composite factors of varying weight, such as proportions of all track miles, relative investment according to Interstate Commerce Commission records, relative car miles, passenger miles and ton miles, and proportionate operating revenue, (See Burpee, record, pages 2808 *et seq.;* Merriman, record, pages 2992 *et seq.*)

We think it requires no extended analysis of the testimony of these witnesses to demonstrate that what they offer is not evidentiary material bearing upon true value, but proposals of methodology in valuation from the standpoint of principle. In the light of the cases hereinabove referred to, which settles as authoritative under the statutes of this state the methodol-

ogy adopted historically by the State Tax Department and applied for the years here in question, the offer of such testimony does not avail to circumvent the application of the rule of *res judicata* in these cases. The issues presented are substantially the same as those raised by the same petitioners in all of the cases since the appeals of the 1933 taxes. If what is here offered through these witnesses be regarded as indeed constituting new evidentiary matter, the application of *res judicata* is nonetheless indicated, the rule being that where the *issue* is the same as in the prior litigation (*i. e.*, the propriety of the methods of assessment employed by the State Tax Commissioner under the laws of the state), the parties are concluded as respects any proof or matter which might have been presented in support of the issue concluded. *Grubb* v. *Public Utilities Commission*, 281 *U. S.* 470, 475; *Baltimore S. S. Co.* v. *Phillips*, 274 *Id.* 316, 319; *Southern Railroad Co.* v. *United States*, 183 *Id.* 519, 528, 533; *Bates* v. *Bodie*, 245 *Id.* 520, 526. As noted above, the Third Circuit Court of Appeals, in passing on the 1934, 1935 and 1936 cases, held the petitioners concluded by the prior proceedings, and particularly by the decision of the Supreme Court of this state in the 1933 case. See *supra*.

It is to be noted, moreover, that Mr. Burpee did testify before this board on behalf of the major systems in the 1934 case, and in the United States District Court in the 1934-1936 cases. This expert admitted that his fundamental approach to the questions involved was the same in these cases as in his testimony in the other litigations. (Record, pages 2896, 3032.) Therefore, so far as the attempt of petitioners to escape the doctrine of *res judicata* is based upon the testimony of Mr. Burpee (and that of Mr. Merriman is of similar claimed effect), it cannot advance past the barrier of the decision of this board in the 1934 case, which was never appealed by the railroads, or past that of the Third Circuit Court of Appeals, as to federal constitutional issues raised, in the 1934-1936 cases.

Passing from the question of method to that of ultimate inquiry, the true value of the railroad properties for the years in question, we must conclude that the presumption of correct-

ness attending the assessments as made, *Central Railroad Co. v. State Tax Department (Court of Errors and Appeals, 1933)*, 112 *N. J. L.* 5, 8; 169 *Atl. Rep.* 489, has not been overcome by petitioners in this case. We have seen that the method of valuation judicially sanctioned in this state places heavy emphasis upon a physical appraisal and valuation of the tangible properties, in detail. Petitioners' experts made no careful inspection of the properties in detail. Such physical inspection as was made by Mr. Burpee was admitted by him to have played no part in his valuation results. (Record, pages 3034, 3038.) He further disregarded in its entirety the significance of the separate classifications of property called for by the Railroad Tax Act. He gave no consideration to the question of how his allocated system values could be apportioned to the four separate property classes, the determination of which is mandatory upon the State Tax Commissioner. (Record, page 3114.) The prior experience of petitioners' witness, Merriman, was limited to the valuation of securities and to the valuation of railroad property by the security method (Record, page 3353.)

We have further seen, hereinabove, that peculiar weight is attached by the statute to the personal judgment and experience of the commissioner in the matter of valuation. In addition to what has been stated elsewhere, the status of his determinations as the assessor of first instance is subject to the observations of the Supreme Court in the recent case of *The Colonial Life Insurance Company of America v. State Board of Tax Appeals* (March 12th, 1941):

"While it is the undoubted function of this court to revise an inordinate valuation (*R. S.* 1937, 2:81-8; 54:4-59), due regard must needs be had for the experience of the county and state boards of taxation in matters of appraisement. In passing upon a value fixed by the old state board of equalization of taxes, this court said: 'The valuation having been adjudged by a statutory tribunal erected for the particular purpose and experienced in such matters, this court will be loth to interfere with its findings on matters of fact * * * unless the evidence is persuasive that injustice has been done.' "

The same personnel through which the department has administered the duties of assessment of railroad property in the years giving rise to the several litigations referred to above, and long before, was in charge of the assessments for the years here under appeal, and the method has been fundamentally the same at all times. (Record, page 3753.) Briefly summarized, that method consists of an examination of the statutory returns filed by the railroads, a check-up in the field of the data disclosed, and an independent examination of all of the physical plant. (Record, page 3755.) Upon this basis, primary valuations are arrived at, corrected for physical and functional depreciation. The valuations are separate for each railroad company and are divided into the four statutory classes. While the department regards it as impractical to place great weight upon capitalized earnings or stock and bond values, as not feasible of allocation to the separate statutory classes of railroad property, or, in the case of second class property, among the taxing districts (record, page 3761), it nevertheless does attribute some weight to the factor of earnings as an element influencing the determination of functional depreciation of railroad property. (Record, pages 744, 745.) A consideration of *Exhibit R-33*, introduced in evidence by the department, disproves the assertion of petitioners' that the assessment process is merely a mechanical addition of new property to the pre-existing inventory, and a deduction therefrom of retired property. It shows that for the seven major systems in the state, whereas there were additions of new railroad equipment of $49,073,371, and retirements of old equipment to the extent of $24,882,701, both being figures for the period 1929-1938, nevertheless there were over-all reductions in valuations during that period aggregating $54,966,507.

The comparative earnings assessment tables of the years since the 1933 assessment litigation, wherein the Supreme Court sustained the 1933 valuations, clearly establish that the earnings factor does not indicate excessiveness in the 1937-1938 assessment figures of the major systems, assuming, as we must, the correctness of the 1933 valuations. While there was a sharp drop in revenues from 1931 to 1932 (correspond-

ing to the tax years 1933 and 1934), there was a steady recovery thereafter, and by 1936, almost a full return to the 1931 figures, in most cases. As to the assessment totals, on the other hand, there was a marked decline for all of these systems from 1933 to 1938. The tables follow:

### DELAWARE, LACKAWANNA AND WESTERN RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1931 | $58,674,838 | 1933 | $85,836,862 |
| 1932 | 46,447,856 | 1934 | 79,283,766 |
| 1933 | 43,339,279 | 1935 | 77,671,977 |
| 1934 | 44,592,530 | 1936 | 74,920,189 |
| 1935 | 44,722,233 | 1937 | 72,877,423 |
| 1936 | 49,728,116 | 1938 | 71,090,473 |

### LEHIGH VALLEY RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1931 | $50,024,627 | 1933 | $45,694,813 |
| 1932 | 38,739,138 | 1934 | 44,428,521 |
| 1933 | 38,177,450 | 1935 | 44,176,732 |
| 1934 | 39,866,526 | 1936 | 43,386,018 |
| 1935 | 40,641,557 | 1937 | 42,668,069 |
| 1936 | 49,156,379 | 1938 | 42,530,434 |

### ERIE RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
|---|---|---|---|
| Calendar Year | Amount | Tax Year | Amount |
| 1931 | $79,227,205 | 1933 | $49,194,482 |
| 1932 | 64,841,762 | 1934 | 48,493,831 |
| 1933 | 63,156,702 | 1935 | 47,628,175 |
| 1934 | 66,176,076 | 1936 | 45,938,958 |
| 1935 | 66,125,406 | 1937 | 46,235,536 |
| 1936 | 73,937,442 | 1938 | 45,810,255 |

## CENTRAL RAILROAD OF NEW JERSEY

| GROSS REVENUES | | N. J. ASSESSMENTS | |
| --- | --- | --- | --- |
| Calendar Year | Amount | Tax Year | Amount |
| 1931 ...... | $38,243,100 | 1933 ....... | $102,351,077 |
| 1932 ...... | 29,467,838 | 1934 ...... | 97,915,002 |
| 1933 ...... | 26,649,697 | 1935 ...... | 93,821,901 |
| 1934 ...... | 28,312,687 | 1936 ...... | 87,152,575 |
| 1935 ...... | 28,859,337 | 1937 ...... | 84,152,575 |
| 1936 ...... | 31,073,680 | 1938 ...... | 82,022,186 |

## NEW YORK CENTRAL RAILROAD

| GROSS REVENUES | | N. J. ASSESSMENTS | |
| --- | --- | --- | --- |
| Calendar Year | Amount | Tax Year | Amount |
| 1931 ...... | $382,190,183 | 1933 ...... | $30,010,862 |
| 1932 ...... | 293,636,140 | 1934 ...... | 28,020,641 |
| 1933 ...... | 283,341,102 | 1935 ...... | 28,110,728 |
| 1934 ...... | 295,084,881 | 1936 ...... | 25,987,941 |
| 1935 ...... | 310,192,980 | 1937 ...... | 25,919,135 |
| 1936 ...... | 361,063,872 | 1938 ...... | 25,705,141 |

And finally, the moderateness of the 1937 and 1938 figures, assuming the correctness of the 1933 assessments approved by the Supreme Court, is most persuasively established from the mouth of petitioners' witness Burpee. Questioned as to his estimate of the prospects of future railroad earnings, as of the assessing dates, he testified as follows (record, pages 2,836, 2,837):

"*Q.* Well, in your opinion, as a result of your studies, Mr. Burpee, were there any special factors, considerations showing to your mind the value of these railway properties in New Jersey at the close of 1935 and 1936 from which you could determine or base a determination as to their prospective earnings? *A.* Yes, sir, I believe there was. As to each of the specific properties, there were certain indications, during 1935 and again during 1936 from which, on the basis of which, an opinion could be formed as to possible prospects. *Q.* And what are they? *A.* Speaking generally now, because I want to

discuss in connection with these railroads, the particular situation indicated for each of the roads; speaking generally, at the end of 1935, there were indications that it was not a remote possibility that the earnings of the railways would reach the levels of 1930. During 1936 production and trade throughout this country increased quite rapidly and car loadings increased, particularly during the latter part of 1936. All of the railways that we are dealing here with showed better car loadings in 1936 than during 1935. Railway security prices also rose, generally, during 1936 * * *."

For the reasons detailed above, we must conclude that the assessments appealed from have been arrived at in a lawful manner and that they are not shown to be excessive. There has been no proof whatever to indicate that they are discriminatory, as charged.

We have now to consider the subsidiary questions argued by counsel for petitioners. Of these the first is the complaint that the Tax Commissioner has unlawfully added extraneous factors of value to the full land values. Specifically, it is charged that in the assessing process for land values, the commissioner first took neighboring land values, and then added thereto elements of cost in fitting the land to railroad use, such as clearing, grading, retaining walls, grade crossing eliminations, &c. It is asserted that the land values first arrived at must be presumed to represent full value, to which nothing can lawfully be added. The contention urged is specious. Railroad land, including main stem, must be valued in the condition in which it is actually held, as is property generally. *Trustees of Stevens Institute* v. *State Board* (*Supreme Court*, 1928), 105 *N. J. L.* 99; 143 *Atl. Rep.* 356. Work done on land which fits it for special use, thereby enhancing its value, should certainly be considered in fixing the value of the land. *Emerson* v. *State Board* (*Supreme Court*, 1928), 6 *N. J. Mis. R.* 326; 141 *Atl. Rep.* 23. That the commissioner, for his own working purposes, first arrives at unofficial land values, and then revises them in the light of the work done and structures erected thereon to suit the land for railroad use, does not derogate from the soundness of the ultimate result as representing the true value of the land, in his judgment as assessor of first instance.

We are, furthermore, unreceptive to the view that the cost of grade crossing eliminations should not be considered in valuing class I property, because required by law for the benefit of the passing public, and not inherently needed for railroad uses. It appears to us that a capital expenditure which must be regarded as essential to a railroad enterprise, in modern times, is the cost of grade crossing eliminations, as well as of anything else which, as a matter of public policy, the law of the state imposes upon a road as a condition of its continued operation. The making of that expenditure must be considered, *pro tanto,* as an asset, or as an element of value to the railroad, in the same sense as the cost of erecting passenger stations, signal systems, or the multitude of other facilities which must be provided by a going road, though not directly used for the actual transportation of persons or freight.

A positive indication that the legislative intention is that such grade crossing costs be included as an element of value, if constructed prior to 1929, is found in the enactment by the legislature of *Pamph. L.* 1931, *ch.* 227 (*R. S.* 54:22-2; *N. J. S. A.* 54:22-2), providing as follows:

"The value of the main stem of each railroad and of the other real estate thereof used for railroad purposes in each taxing district of this state to be ascertained pursuant to subdivisions I and II of section 3 of the act to which this act is a supplement shall be arrived at without including any part of the cost of improvement, relocation, reconstruction, elimination or avoidance of highway grade crossings, including state highways made pursuant to chapter 88 of the laws of 1929, or chapter 101 of the laws of 1930, or pursuant to the provisions of any agreement for any of such purposes with a municipality hereafter made; provided that such exemptions shall apply only to existing main lines or branches."

The testimony of the tax department representatives is that the grade crossing eliminations referred to by the act are not included as elements of valuation in the 1938 and 1939 assessments. (Record, page 3861.) Had the legislature so intended, it might have easily provided, when enacting the 1931 statute, that *all* such projects, no matter when con-

structed, be omitted from consideration in valuation of railroad lands. That it failed to do so, implies a sanction for the practice of the commissioner in considering such structures as were erected prior to those referred to in the act. *Expressio unius est exclusio alterius.*

A further specific complaint of the Lackawanna system petitioner is that there has been included in the property assessed to it certain floating equipment plying between the Morris and Essex Railroad terminal at Hoboken and Jersey City, and New York points of dockage. It is contended that the property has no actual *situs* in New Jersey and is therefore not assessable in this state, the Delaware, Lackawanna and Western Railroad being a foreign corporation. So far as appears from the record, the permanent base of operations of the equipment, when not in active use, is at the terminal of the railroad in this state. It has for many years past been assessed in this state, and taxes presumably have been paid thereon, without any question as to *situs*. No testimony has been introduced by the railroad which would tend to overcome the normally applicable presumption of the correctness of the action of the State Tax Commissioner in assessing this property in New Jersey for the years 1937 and 1938. There is no proof to the effect that as of and upon the assessing dates, this equipment was not situated in New Jersey. The cases cited by petitioner are not in point, involving property actually shown to have had no *situs* in the state seeking to tax it (*American Mail S. S. Co.* v. *Crowell* (*Supreme Court,* 1908), 76 *N. J. L.* 54; 68 *Atl. Rep.* 752), or assessments against a company which did not own the property in question. *West Shore Railroad Co.* v. *State Board* (*Supreme Court,* 1911), 82 *N. J. L.* 37; 81 *Atl. Rep.* 351.

It is agreed by the Central Railroad Company of New Jersey and the State Tax Department that the assessment levied against that company for the year 1937 upon a parcel of land known as Lot 1, Block 64 on the tax map of the taxing district of Dunellen, be canceled and it will be so ordered. As to all of the other assessments brought before us upon these appeals, judgments of affirmance will be entered.